[Civ. No. 20394. Second Dist., Div. Three. Mar. 4, 1955.]

M. N. THACKABERRY, Respondent, v. BEN D. PEN-
NINGTON et al., Defendants; WILLIAM V. HEIDE
et al., Appellants.

Barry Brannen and H. F. Poyet for Appellants.

Arnerich, Del Valle & Sinatra and B. R. Ware for Re-
spondent.

VALLÉE, J.—Appeal by defendants from a judgment for
plaintiff in an action brought by him as an alleged third
party creditor beneficiary of a contract. The contract sued
on was executed on November 22, 1947, by Ben D. Pennington,
Lewis E. Dunham, and defendants Heide and Davenport.
Pennington and Dunham were named parties defendant but
were not served. There is no conflict in the evidence.

A rather extended statement of the facts is necessary to
an understanding of the question to be decided. On August
16, 1946, Pennington and his wife acquired title to the 150
lots in Tract 603 from the McFaddens for $105,000. Plaintiff
advanced the down payment of $30,000. The balance of
$75,000 was evidenced by two promissory notes, each in the
principal sum of $37,500, executed by the Penningtons and
secured by two deeds of trust. Each note was payable in in-

stalments of $17,500 on May 10, 1947; the balance on May 10, 1948. The deeds of trust provided that individual lots could be released upon the payment of specified release prices which would be credited to the promissory notes.

In October 1946 plaintiff and Pennington executed an agreement in which Pennington acknowledged that he and his wife held the title to the tract as trustees for plaintiff and himself and whereby they agreed: to form a corporation to be known as Pennington and Thackaberry, Inc., to which Pennington would convey the property; the property would be subdivided and lots sold by Pennington for cash; release prices would be paid on the trust deed notes; the balance would be deposited in a joint bank account and after payment of expenses, cost of improvements, and the advances of plaintiff, would be divided equally; and Pennington as his own enterprise could build on the lots and Thackaberry would have no interest therein. The agreement was not recorded.

Pennington and Thackaberry, Inc., was organized, but Pennington never conveyed the property to it. On several occasions, and as late as the first part of 1949, plaintiff requested Pennington to transfer the property to the corporation. Pennington promised to do so each time but never did. Plaintiff "didn't force the issue."

Between November 1946 and February 1947 Pennington sold 16 lots and commenced to build houses on them. On May 10, 1947, the first instalment became due on the promissory notes. The total of the release prices paid on the 16 lots was insufficient to pay it. On May 13, 1947, at Pennington's request, plaintiff advanced an additional $11,363.24 to meet the payment. In 1949 plaintiff received $3,411.51 from the sale of the 16 lots, of which $1,070.53 was the balance of the joint bank account.

Pennington had difficulty financing the construction of the houses on the 16 lots. In April 1947 he contacted defendant Heide, who was an officer of a mortgage and escrow company and was engaged in setting up subdivisions for the company. Pennington told Heide he had 134 lots in Santa Ana and wanted either to sell the lots or procure a loan for the construction of houses. Heide checked the title records and found that Pennington had title to the land, subject only to the McFadden deeds of trust. Later Pennington met Dunham, who was an officer of the same company as Heide, and defendant Davenport, a real estate broker who was

associated with Heide in construction projects. Pennington told them he had bought the property for $105,000; plaintiff had put up $30,000; there was a trust deed payment coming due; he was in the process of constructing houses on 16 of the lots; and he needed money to finish the houses. He further stated Builders' Control had stopped all his disbursements. Heide then advanced money to Pennington.

In June, Pennington told defendants and Dunham that he needed $15,000 to finish the houses on the 16 lots and for bills on another construction job. He stated that the balance owing on the 134 lots was only $40,000 and that the reason he was broke was because he had to put up money for the May instalment on the promissory notes. He did not say anything about plaintiff's having advanced $11,363.24. Davenport suggested that Pennington ask the McFaddens to release 44 of the lots and he would try to arrange a loan on the property. Davenport testified it is common practice in housing projects for the landowner to give the builder several free lots so that he can place his construction loans on those lots and get his construction program started. Discussions were had between Pennington, Dunham, Heide, and Davenport with respect to forming a corporation for the construction of houses on the balance of the property, 134 lots, and to transfer one-third of the lots, 44, to the corporation. Defendants and Dunham told Pennington that if they obtained a loan, they expected to form a corporation, take the 44 lots, and construct houses on them on a speculation basis, "which was approximately a third of the 134 lots remaining, and then at a later date when we had finished the 44 lots, we would use those funds or profits, if there were any, to purchase the 90 lots which remained in the subdivision, and proceed then to build out the whole tract." Davenport told Pennington he was interested in forming a construction company provided all of the remaining lots, 134, were conveyed to the corporation. Pennington said the proposed corporation should return to plaintiff the money he had advanced, on condition the corporation be formed to take title to the 134 lots.

Defendants and Pennington discussed with the McFaddens the proposition of the latter's releasing 44 lots without the payment of the release prices from the deeds of trust. Davenport told them it was his idea to get the lots released and clear in order to borrow construction money on them so that the program could be started. He also told them that their corporation would endeavor to pay them the $40,000 owing on the

deeds of trust out of the sale of the houses on the first 44 lots and that later Pennington would convey the title to the remaining 90 lots to the corporation and it would build houses on the lots. Pennington said, "That is correct." There was ample security for the $40,000 in the remaining 90 lots, and the McFaddens agreed to release the 44 lots.

Because Pennington needed $15,000 to finish the 16 houses and pay the moneys that Heide had advanced to him, Davenport contacted a Mr. Pollack, who was willing to buy the 44 lots for $15,000 and give Pennington an option to repurchase them within 90 days from June 26 at $400 a lot. McFaddens released the 44 lots on June 26. On the same day Pennington conveyed the lots to Pollack subject to right to repurchase, and on July 8 he received the $15,000.

Between June 20 and June 26, Pennington, Dunham, and defendants decided to form Anaheim Construction Company, sometimes referred to as the corporation, and that the four should hold the following offices: Pennington, president and director; Dunham, vice president and director; Heide, secretary-treasurer and director; and Davenport, director. Discussion was also had as to the disposition of stock: Pennington was to receive 40 per cent, the three others were each to receive 20 per cent. Heide testified that further discussion was had "with regard to the full 134 lots. We were going to take title to the 44 lots, and then at a subsequent date we would take title to the 90 and pay Thackaberry and McFadden. . . . We would construct houses on the 90 lots after we had finished the 44 lots."

The articles of incorporation of Anaheim Construction Company were filed in the first part of July. A permit to issue 100 shares of stock to Pennington in consideration of his transferring the 44 lots to the corporation was granted on August 28. The stock was not issued until November 5, when the certificate was placed in escrow as part of an escrow transaction in which Pennington repurchased the 44 lots from Pollack.

On July 17 Pennington gave Heide a power of attorney to act with Builders' Control in order to finish the houses on the 16 lots. In the early part of September, the curbs, sidewalks, and driveways still had to be put in, but the contractors would not perform their work because they were not receiving their money from Builders' Control. Heide and Davenport talked to the men and persuaded them to proceed with the work and, as officers of Anaheim, gave them

a written guarantee that the corporation would see that they were reimbursed for completing the improvements on the 16 lots. Pennington told defendants and Dunham that in consideration of Anaheim's assuming this obligation the corporation would get the remaining lots, 134. On the strength of the corporation's commitment, the improvements were put in and the funds were released.

Efforts were then made to obtain a loan for the construction of houses on the 44 lots. After discussions with Laguna Federal Savings and Loan Association, Pennington, Dunham, and defendants agreed that Anaheim would apply to Laguna Federal and request it "not only [to] make the 42 loans, but also make the 90 loans at a subsequent date." Laguna Federal "was interested in proceeding with the 90 lots" but would only make loans on 42 of the 44 lots at that time. On September 11 Laguna Federal requested a personal indemnity agreement guaranteeing the construction of 42 houses on the lots, to be signed prior to the date of commencement of construction, and personal financial statements from the four incorporators of Anaheim. The agreement was executed in November.

At this time, in September, it was realized that Anaheim would have to pay Pollack the funds Pennington had borrowed. Heide personally gave Pollack $600 to extend the option two months, until November 26, which date was selected to have all other preliminary transactions closed.

On November 5 the corporation obtained final loan commitments from the Federal Housing Administration and the Veterans Administration and completed the final arrangements with Laguna Federal, with the exception of the personal indemnities. On that date two escrows were opened: one for the repurchase of the 44 lots from Pollack by Pennington for $12,600 together with an unsecured note in the amount of $8,400; and a second whereby Anaheim placed in escrow the 100 shares of its stock issued to Pennington in consideration for the 44 lots, with the agreement that prior to close of escrow Pennington would endorse the stock certificate and Anaheim would reissue the stock so that Pennington would receive 40 shares and the others 20 shares each, and Laguna Federal would deposit 42 notes and deeds of trust in the amount of $8,100 each for recordation. The two escrows were to be closed concurrently.

Between April 1947 and November 1947 Pennington, Heide, Davenport, and Dunham had many discussions about the "full

number of lots, the 134 lots of the entire subdivision, that the Anaheim Construction Company would build on those lots." Davenport testified, "Due to the necessity of having a certain amount of credit with the Federal Housing Administration and the Laguna Federal Savings and Loan Association, I suggested to the other members of the corporation that we do the construction of the 134 lots in three units. That would require less cash, and we would qualify. So that is why we divided it up into three units, and started out with the 44 lots and 42 houses. Then we were going to acquire more lots during the construction period, because it takes you at least 60 days to process your deal through the Federal Housing Administration and your lending institutions." He further testified he "wouldn't have gone into the deal on 42 houses." However, it was not until the first part of November that they had any "real heavy discussions" as to how the $40,000 due the McFaddens on the 90 lots would be handled and paid, because prior to that time they did not know whether the Federal Housing Administration would give them the requested number of loans or the type of loans they wanted, or if they could get a good sales program with the Veterans Administration.

About November 7th or 8th, because of the personal credit of Heide, Davenport, and Dunham and their personal guaranty that all the houses within the subdivision would be completed free and clear of any liens, Laguna Federal allowed them to draw $12,600 from the construction fund and deposit it in the first escrow. A notation was made in the second escrow authorizing the transfer of $12,600 to the first. On November 15 the escrow instructions were amended whereby instead of the unsecured note provided for in the original instructions, a deed of trust executed by Pennington and Dunham on November 14, 1947, was placed in escrow securing payment of a note for $8,400 in favor of Pollack. The amendment also stated that the deed from the Penningtons to Anaheim was placed in the escrow to be recorded at its close. The deed was the conveyance of the 44 lots and was executed by the Penningtons on November 14.

Discussions were then had relative to Anaheim's taking title to the 90 lots because there wouldn't be enough profit in the 42 houses. Pennington was told by Heide, Davenport, and Dunham that Anaheim would pay the McFaddens out of the profits from the sales of the 42 houses and it would take care of plaintiff when it got the 90 lots and had con-

structed houses on them. Heide testified, ''We said we wanted to have something definite; that when we got title to those 90 lots, that we would see—with our 60 percent of the corporation stock, that we would see that the corporation did thus and so. . . . that the corporation out of the sale funds of the 42 lots, that we would see that McFadden was paid, when we were able to procure the 90 lots, and also that we would take care of Mr. Thackaberry at the time we could get title to the 90 lots. The 44 lots we knew were going to be deeply encumbered by us trying to help out Mr. Pennington, and that he admitted in the conferences . . . that there would be very little profit out of the 44 lots, because we had taken on the obligation to pay Pollock back, and the corporation had assumed the monies that I had advanced to Ben Pennington . . . and we knew we would have to assume—other liabilities of Ben Pennington, which we did in the course of our business.'' Davenport testified, ''The corporation was to pay the obligations by getting the first 44 lots clear. Then out of the proceeds of the sale of the houses Mr. McFadden could be paid off, and that would clear the balance of the lots. . Then they would go after 45 more lots, and go borrow on them, and build those and have funds to proceed on. . . . During the construction period of the first 42 houses, we were to get title to the next 45 lots and proceed. . . . We estimated there would be profit of 10 percent, which would be some $42,000 profit on 42 houses. . . . We would endeavor to pay him [McFadden] out of the first 44. . . . Then by doing that we would clear the balance of the lots, and we could take another 45, and then we would start paying Thackaberry out of the next 45 houses, which would be sufficient to pay Thackaberry off.''

After many discussions, the memorandum agreement, on which plaintiff relies, was signed on November 22 without legal advice. It reads:

''MEMORANDUM OF AGREEMENT, NOVEMBER 22, 1947

''In connection with the construction of houses by the Anaheim Construction Co., which has been Incorporated by the undersigned, on the balance of the lots in Tract 603, Magnolia Place, Santa Ana, California now held by Ben D. Pennington, it is agreed as follows:

''1. That A. J. McFadden shall be paid the sum of $40,000.00 out of the sales of the first 42 houses.

''2. That M. N. Thackaberry shall be paid in full for funds advanced in connection with the above Tract.

"3. That the stock in the Anaheim Construction Co. be divided as follows:

| | |
|---|---|
| Ben D. Pennington, | 40% |
| Lewis E. Dunham | 20% |
| William V. Heide | 20% |
| A. G. Davenport | 20% |
| | 100% |

Ben D. Pennington     [Signed]
Ben D. Pennington

Lewis E. Dunham     [Signed]
Lewis E. Dunham

William V. Heide     [Signed]
William V. Heide

A. G. Davenport     [Signed]
A. G. Davenport"

On the 23d, Laguna Federal was told that Anaheim was going to proceed with the 44 lots and that at a subsequent date it would get title to the 90 lots. Heide testified that the obligation to McFadden of $40,000 was not entered in the corporate books; the corporation never ratified the agreement of November 22 because it never received title to the 90 lots; no corporate action was taken concerning that agreement. Heide further testified that "This was a memorandum that as of a future date the officers would have the corporation act according to that memorandum, when we got title, it says, to the balance—that the Anaheim Construction Company got the balance of the lots in the subdivision, . . . would do the following, and that was, to-wit, that we would pay McFadden $40,000; that we would pay Thackaberry the funds that he had advanced in connection with the purchase of the 150 lots in that subdivision." Davenport testified the memorandum was an "individual agreement" in which the individuals were "bound to have the corporation do a certain thing upon the happening of a certain event. . . . upon the corporation getting the balance of the lots, the 90 lots"; the corporation did not take any action with regard to plaintiff's advancements. Defendants testified they did not know the amount Pennington owed plaintiff; therefore, the sum was not put in the agreement. They also testified that Pennington would not show them his agreement with plaintiff, and according to the title records Pennington had clear title to the 90 lots.

The two escrows of November 5 were closed on November 25; the next day construction was begun on the 42 lots and the houses were completed in December 1948. Between September 1948 and February 1949 all the houses were sold. All of the bills were paid. The secured note payable to Pollack for $8,400 was paid by Anaheim out of the receipts from the sale of the houses. The $15,000 risk capital which Pennington obtained from Pollack cost Anaheim $24,952. There was no profit from the construction of the 42 houses; Heide had to pay the last franchise tax due. Anaheim never paid any dividends or salaries.

McFadden was not paid anything while the 42 houses were being constructed, nor did he receive anything out of the sales of the 42 houses and the two lots.

Several times during the construction of the 42 houses there was discussion about proceeding with construction on the 90 lots and making a payment to McFadden. Meanwhile, unknown to defendants, Pennington was surreptitiously selling the 90 lots. He sold the first one on February 11, 1948, and by October 1, 1948, he had sold a majority of them. The last lot was sold on January 30, 1950. The aggregate sales price of the 90 lots was $97,825. He did not repay plaintiff any of his advances except $3,411.51 from the proceeds of the sale of the 16 lots.

In November 1948 Heide learned that Pennington had sold 60 of the 90 lots to a construction company and that construction had started on two of them. He tried to talk with Pennington, but he was in Texas. When Pennington returned Heide asked him why he had sold the lots, that "I thought we were going to continue with our program as outlined." Heide testified that Pennington said "it wasn't any of my business, and he had already sold the lots, there wasn't anything he could do." Heide informed Davenport of the situation, and in December 1948 they decided to abandon the idea of going ahead on the 90 lots. On February 16, 1949, Davenport wrote a letter to Pennington advising him that he considered that Pennington had breached his contract in selling the 90 lots. That letter and several other pieces of correspondence were returned by the post office department. The 90 lots were never conveyed to Anaheim.

Plaintiff testified he visited the tract three or four times. In 1948 he saw houses constructed on lots in the area of the first 16 lots and in the area of the 44 lots. The last time he saw Pennington was in the first part of 1949 when he asked him to transfer the 90 lots to Pennington and Thackaberry,

Inc. He knew at that time Pennington had transferred the 44 lots to Anaheim, but Pennington said he had not gotten anything out of the transaction. He did not meet or talk with defendants. In 1950 he learned that Pennington had sold the 90 lots.

Plaintiff never made any demand or request on defendants or Dunham for payment of the moneys he had advanced to Pennington. Davenport testified that it was not until the spring of 1950 when he went to plaintiff's office to learn where Pennington was that he met plaintiff for the first time. At this meeting, Davenport told plaintiff "what we had done down there, the houses we had built, and what the deal was." Plaintiff did not tell Davenport that defendants owed him any money. The first time Heide met plaintiff was during the trial of this action. This action was filed November 21, 1951. Prior to the filing of the action neither Heide nor Davenport knew the terms or conditions on which plaintiff had advanced the money to Pennington nor did either of them know the advances were covered by the agreement of October 1946.

The court, among other facts, found: that by the agreement of November 22, 1947, "Pennington, Heide, Davenport and Dunham, and each of them, jointly and severally, expressly promised and agreed that within a reasonable time after November 22nd, 1947 they and each of them would pay to the plaintiff in full all of the . . . funds advanced by him in connection with said tract"; the reasonable time within which defendants promised and agreed to repay plaintiff was nine months from November 25, 1947, the date when the 44 lots were transferred to the corporation, and which time expired on August 25, 1948; each defendant has refused and failed to pay the balance of $37,951.73 advanced by plaintiff, and the whole is now due and owing. Judgment was that plaintiff recover from defendants, jointly and severally, the sum of $37,951.73, together with interest from November 21, 1951, the date of the filing of the complaint.

Defendants contend the evidence does not support the findings and assign several errors with respect thereto. It is only necessary that we consider one of the claimed errors: The undertakings in the agreement of November 22, 1947, to pay McFadden and Thackaberry are conditioned on the conveyance to Anaheim of the balance of the lots in the tract and since the balance of the lots were not conveyed to Anaheim no liability to plaintiff-Thackaberry arose.

As was said earlier, the evidence is uncontroverted that defendants from their very first discussions with Pennington planned to construct houses on all of the 134 lots in the tract in order to make the program profitable. After defendants had negotiated and secured the necessary construction loans on the 42 lots and had personally obligated themselves to Laguna Federal, the agreement of November 22, 1947, was executed.

The agreement is definite and certain with one exception.[1] The first six lines are that "In connection with the construction of houses by the Anaheim Construction Co., . . . on the balance of the lots in Tract 603 . . . now held by Ben D. Pennington, it is agreed as follows. . . ." The only matter not made clear by this language is what lots are referred to by "the balance of the lots in Tract 603 . . . now held by Ben D. Pennington." The only lots then held by Pennington were the 90 lots. Title to the 44 lots had already been conveyed to Anaheim; "the balance of the lots" was the 90 lots. The word "connection" is defined by Webster to mean: union, mutual dependence, relationship, logical sequence, conjunction, etc. Conveyance of the 90 lots is an integral and essential part of the agreement. It is a condition precedent to the promises which follow. The promises that follow are in conjunction with the construction of houses by Anaheim on the 90 lots—that is, when Anaheim received title to the 90 lots from Pennington the promises would be performed. To construct houses on the "balance of the lots"—the 90 lots— Anaheim had first to obtain title thereto. The promises that follow are: (1) that when Anaheim received title to the 90 lots, McFadden "shall be paid" $40,000 out of the sales of

---

[1] We recopy the memorandum for convenience:

"MEMORANDUM OF AGREEMENT, NOVEMBER 22, 1947

"In connection with the construction of houses by the Anaheim Construction Co., which has been Incorporated by the undersigned, on the balance of the lots in Tract 603, Magnolia Place, Santa Ana, California now held by Ben D. Pennington, it is agreed as follows:

"1. That A. J. McFadden shall be paid the sum of $40,000.00 out of the sales of the first 42 houses.

"2. That M. N. Thackaberry shall be paid in full for funds advanced in connection with the above Tract.

"3. That the stock in the Anaheim Construction Co. be divided as follows:

| | |
|---|---|
| Ben D. Pennington, | 40% |
| Lewis E. Dunham | 20% |
| William V. Heide | 20% |
| A. G. Davenport | 20% |
| | 100%" |

the first 42 houses, and (2) that when Anaheim received title to the 90 lots, plaintiff "shall be paid" for funds advanced. The McFadden deeds of trust were on the 90 lots, not on the 44 lots. Because it was anticipated that a profit of $42,000 would be made from the construction of 42 houses on the first 44 lots, the parties agreed that from this source McFadden "shall be paid" and he would release the 90 lots from the deeds of trust. It is to be observed that the action is to recover the entire amount of plaintiff's advances, not in connection with the 44 lots, but in connection with the entire 150 lots in the tract. It would be unreasonable to assume that defendants intended to pay plaintiff on the conveyance of the 44 lots to Anaheim when his advances were for the purchase of the 150 lots.

To construe the memorandum as a promise of defendants to pay plaintiff the advances he had made on the conveyance of the 44 lots to Anaheim would be to completely disregard the condition of the first six lines of the agreement and ignore the elemental rule that, if reasonably practicable, all parts, every word, of an agreement are to be given effect. (Civ. Code, § 1641; *Hunt* v. *United Bank & Trust Co.*, 210 Cal. 108, 115 [291 P. 184].) It would be excising and giving no meaning to six of the 12 lines of the agreement. The parties agreed, not that McFadden and plaintiff should be paid in any event or on the conveyance of the 44 lots to Anaheim, but that they should be paid in connection with the construction of houses by Anaheim on the 90 lots. Any obligation to pay plaintiff was conditioned on the conveyance of the 90 lots to Anaheim. Since the condition did not eventuate, the obligation did not accrue.

The findings that by the agreement of November 22, 1947, defendants promised and agreed that within a reasonable time after that date they, and each of them, would pay plaintiff the funds advanced by him, and that such reasonable time was nine months from the date the 44 lots were transferred to Anaheim, are vital to the judgment. They are unsupported by any evidence. Without them the judgment cannot stand.

Reversed.

Shinn, P. J., and Ashburn, J. pro tem.,* concurred.

A petition for a rehearing was denied March 30, 1955, and respondent's petition for a hearing by the Supreme Court was denied April 27, 1955.

*Assigned by Chairman of Judicial Council.