[No. D009875. Fourth Dist., Div. One. Aug. 29, 1989.]

APPALACHIAN INSURANCE COMPANY et al., Plaintiffs and Appellants, v.
McDONNELL DOUGLAS CORPORATION et al., Defendants and Appellants.

6

## COUNSEL

Shaw, Pittman, Potts & Trowbridge, Phillip D. Bostwick, James B. Hamlin, David J. Cynamon, Evans Huber, Rintala, Smoot, Jaenicke & Brunswick, William T. Rintala and Robert A. Rees for Plaintiffs and Appellants.

Bryan, Cave, McPheeters & McRoberts, Thomas C. Walsh, John J. Hennelly, Jr., Steven L. Hogan, Jeffrey W. Morof, Curtis M. Dombek, Adler, Kaplan & Begy, Larry S. Kaplan, Catherine E. Tinker, Richard F. Baylaender, Myra L. Markey, McKenna, Conner & Cuneo, James J. Gallagher, Barbara J. Hensleigh, Lord, Bissell & Brook, Victoria A.

Cloninger, Terry W. Backus, Marc R. Greenberg, Hugh C. Griffin, Diane I. Jennings and Renita Sterling for Defendants and Appellants.

## OPINION

**KREMER, P. J.**—This case involves the failure of a telecommunications satellite owned by Western Union Telegraph Company (Western Union) to reach the desired orbit. Western Union sought to launch its satellite, Westar VI, into orbit from the space shuttle. To reach the desired orbit from the space shuttle, Western Union used an upper stage rocket it purchased from McDonnell Douglas Corporation (McDonnell Douglas). McDonnell Douglas subcontracted with Morton Thiokol and Hitco to manufacture elements of the upper stage rocket. Due to a failure of this rocket, the Westar VI satellite was left in an orbit unsuitable for telecommunication purposes.

Western Union's insurers paid Western Union $105 million for the satellite, treating it as a total loss. Five of the insurers—Appalachian Insurance Company, Commonwealth Insurance Company, Industrial Indemnity, Mutual Marine Office, Inc. and Northbrook Excess & Surplus Insurance Company (hereafter collectively referred to as Appalachian)—sued McDonnell Douglas, Morton Thiokol and Hitco for negligence and strict products liability.[1] The trial court initially granted summary adjudication against Appalachian on its strict liability cause of action and thereafter granted summary judgment in favor of the defendants on the basis the McDonnell Douglas/Western Union contract contained exculpatory clauses barring the causes of action.

On appeal, Appalachian contends summary judgment should not have been granted because the contract provisions are ambiguous, unconscionable, against public interest, do not reflect the parties' true agreement and unlawfully disclaimed strict products liability. Appalachian also contends it should have been granted leave to amend to plead an express warranty from Morton Thiokol. We disagree and therefore affirm.

The defendants also appeal, contending the trial court should have granted summary judgment based on the statute of limitations and on the negligence cause of action because the loss suffered was only "economic." We conclude the statute of limitations did not bar the suit and therefore affirm that ruling. As to the negligence cause of action, since the contract protect-

---

[1] These five insurance companies paid approximately $5 million of the $105 million claim. They named the remaining insurance companies as involuntary plaintiffs.

ed the defendants from liability based on negligence, we need not reach this issue. Finally, McDonnell Douglas appeals the trial court's denial of an award of attorney's fees. We conclude the court did not err in denying attorney's fees and therefore affirm that ruling.

FACTS

In order for a telecommunications satellite to function effectively, it must be placed into a "geosynchronous orbit." A geosynchronous orbit is an orbit in which a satellite remains stationary vis-à-vis a particular location on the earth. This orbit is approximately 22,000 miles above the equator.

Prior to 1981, the National Aeronautics and Space Administration (NASA) launched commercial satellites by NASA's Delta rocket, a three-stage, expendable launch vehicle which could lift a satellite into a geosynchronous orbit. Each Delta carried only one satellite. In the 1970's, NASA decided to phase out expendable rockets and to launch all satellites from the space shuttle. The space shuttle could carry up to four satellites at a time but was not designed to reach the geosynchronous orbit. Instead, the space shuttle orbited at an altitude of 150-160 nautical miles (a parking orbit). To launch satellites from the space shuttle's parking orbit into higher orbits, each satellite needed its own upper stage rocket.

In 1976, McDonnell Douglas proposed to develop such an upper stage rocket for satellites, at its own expense, if NASA agreed not to fund development of a competing system. NASA agreed but did not obligate itself to purchase any hardware from McDonnell Douglas nor promise not to purchase similar hardware or services from other companies. NASA also retained the right to set a ceiling on the price McDonnell Douglas could charge for the upper stage rocket and related launch services.

McDonnell Douglas's upper stage rocket, a power assist module (PAM), had two key components: (1) airborne support equipment, consisting principally of a spin table, cradle, sun shield and related control electronics and hardware designed to hold the satellite in the space shuttle's cargo bay from liftoff to the parking orbit; and (2) a Star 48 motor manufactured by Morton Thiokol which is attached to a satellite prior to liftoff. The nozzle or exit cone of the Star 48 motor was manufactured by Hitco under a subcontract with Morton Thiokol.

Western Union initially contacted both NASA and Arianespace, a French based company of the European Space Agency, to launch its Westar VI satellite. The Ariane rocket was an expendable launch vehicle capable of

placing a satellite into a geosynchronous orbit without the use of a PAM.[2] In 1981, Western Union entered a contract with Arianespace for a December 1983 launch on their Ariane rocket. Subsequently Western Union relinquished its launch reservation with NASA.

Later in 1982, Arianespace had a failure (its second in six launches). It rescheduled Western Union's launch date which caused Western Union to reconsider its decision to launch via Arianespace. At this point, Western Union felt more confidence in the space shuttle than Ariane, believing the space shuttle was better priced[3] and more reliable. By April 1983, Western Union had decided to use the space shuttle "because of economic reasons, and the advantages of the new program and the new vehicle [i.e., the Space Shuttle]."

In December 1982, Western Union began negotiations with McDonnell Douglas for a PAM for its Westar VI satellite. Western Union had previously purchased PAM's from McDonnell Douglas for its Westar IV and Westar V satellites which were launched in 1982. In March 1983, Western Union signed a contract with McDonnell Douglas. The execution of the contract was conditioned on later incorporating an interparty waiver clause NASA would require of Western Union in a launch services agreement. As part of the contract between Western Union and McDonnell Douglas, McDonnell Douglas disclaimed any warranties and Western Union agreed to hold McDonnell Douglas harmless for any loss or damage and to obtain insurance to cover any potential loss.

In January 1984, after having terminated its agreement with Arianespace, Western Union signed a launch services agreement with NASA for a launch on the space shuttle. Western Union drafted an interparty waiver of liability for the McDonnell Douglas contract to comply with a condition in the NASA Launch Services Agreement and submitted the draft to McDonnell Douglas for its approval. McDonnell Douglas approved the draft and the waiver was incorporated, by amendment, into the parties' agreement as article 14.

On February 3, 1984, the Space Shuttle Challenger lifted off carrying Westar VI. About eight hours after liftoff, Westar VI was deployed from the

---

[2] Arianespace promoted itself as having more reliable launch dates and better financial arrangements than NASA's space shuttle. Its manual stated the following advantages of the Ariane rocket over the space shuttle: (1) five- to six-week payload integration time versus three to four months for the space shuttle; (2) higher accuracy of in-orbit injection due to the use of an inertial guidance system as opposed to a "spinned, non-guided motor as PAM stage;" (3) better payload environment which allowed the use of lighter satellite structures; and (4) was automatic and therefore did not require the safety checks of a manned vehicle.

[3] At that time a space shuttle launch cost about $15 million ($9-10 million for the launch and $6-7 million for the PAM) while an Ariane launch cost about $21 million.

space shuttle's cargo bay. The upper stage rocket, scheduled to burn for 85 seconds to boost Westar VI into an orbit which would intersect with the geosynchronous orbit, failed when the Star 48 motor's exit cone, or nozzle, disintegrated about 4 seconds after ignition. Thereafter, the motor nozzle assembly was expelled and the motor extinguished itself. The short burn of the upper stage rocket caused Westar VI to go into a low elliptical orbit around the earth with a maximum altitude of only 655 nautical miles. In this orbit, Westar VI was useless for telecommunication purposes.

Western Union made a claim against its insurance companies for a total loss of the satellite. The insurers paid Western Union about $105 million on the claim.

About three weeks after the space shuttle mission, Hughes Aircraft Corporation (which had manufactured Westar VI) briefed NASA about the possibility of retrieving the satellite. On September 7, 1984, an agreement was reached by Hughes and the majority insurers of Westar VI to retrieve the satellite. In November 1984, Westar VI was retrieved from its improper orbit and brought to Hughes Aircraft Company.

On January 17, 1986, Appalachian filed suit in the Orange County Superior Court against McDonnell Douglas, Morton Thiokol and Hitco, alleging causes of action for negligence and strict liability. On February 14, McDonnell Douglas filed for a petition to remove the case to federal court. Thereafter, on February 18, Appalachian voluntarily dismissed the federal court action and filed a new complaint, containing minor modifications, in the Orange County Superior Court. In federal court, McDonnell Douglas filed a motion to strike or vacate Appalachian's dismissal. The federal court denied the motion, noting that removal had been improper.

DISCUSSION

APPALACHIAN'S APPEAL

I

*Summary Judgment Review*

■ The aim of the summary judgment procedure is to discover whether the parties possess evidence requiring the fact-weighing procedures of a trial. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) "[T]he trial court in ruling on a motion for summary judgment is merely to determine

whether such issues of fact exist, and not to decide the merits of the issues themselves." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 183 [203 Cal.Rptr. 626, 681 P.2d 893].) The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. (*Lichty* v. *Sickels* (1983) 149 Cal.App.3d 696, 699 [197 Cal.Rptr. 137].) ■ While "[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact" (*Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 [228 Cal.Rptr. 620]), it is also true "[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one." (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko* v. *Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107.)

## II

### *The Contractual Provisions*

The trial court here ruled provisions in the contract between Western Union and McDonnell Douglas unambiguously precluded Western Union from suing McDonnell Douglas, Morton Thiokol or Hitco.

■ The fundamental canon of contract interpretation is the ascertainment of the parties' intent. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761 [128 P.2d 665]; *Ticor Title Ins. Co.* v. *Rancho Santa Fe Assn.* (1986) 177 Cal.App.3d 726, 730 [223 Cal.Rptr. 175].) The language of the instrument must govern its interpretation if it is clear and explicit. (Civ. Code, § 1638.) Generally, the words of a contract are to be understood in their ordinary and popular sense (*Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 931 [218 Cal.Rptr. 839]; Civ. Code, § 1644; Code Civ. Proc., § 1861) unless a contrary intent is shown, such as a specialized meaning due to trade custom and practice or a prior course of dealing (see *LaCount* v. *Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754 [145 Cal.Rptr. 244]; Code Civ. Proc., § 1856, subd. (c)).

■ The interpretation of a written contract is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr.

767, 402 P.2d 839]; *Medical Operations Management, Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891 [222 Cal.Rptr. 455].) Extrinsic evidence may be introduced when the terms of the contract are ambiguous. (*Vega* v. *Western Employers Ins. Co.* (1985) 170 Cal.App.3d 922, 927 [216 Cal.Rptr. 592], disapproved on other grounds in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58]; Code Civ. Proc., § 1856.)

■ A court must view the language in light of the instrument as a whole and not use a "disjointed, single-paragraph, strict construction approach." (*Ezer* v. *Fuchsloch* (1979) 99 Cal.App.3d 849, 861 [160 Cal.Rptr. 486, 13 A.L.R.4th 1333].) If possible, the court should give effect to every provision. (Civ. Code, § 1641; *White* v. *Dorfman* (1981) 116 Cal.App.3d 892, 897 [172 Cal.Rptr. 326].) An interpretation which renders part of the instrument to be surplusage should be avoided. (See *Estate of Newmark* (1977) 67 Cal.App.3d 350, 356 [136 Cal.Rptr. 628]; *Thackaberry* v. *Pennington* (1955) 131 Cal.App.2d 286, 297 [280 P.2d 165].)

■ The contract between Western Union and McDonnell Douglas contains two provisions addressing liability and allocation of loss. Appalachian concedes the first of these provisions, article 7, if enforceable, protects McDonnell Douglas from liability but argues it does not similarly protect McDonnell Douglas's subcontractors, i.e., Morton Thiokol and Hitco.

Article 7 provides: "*7. Warranties and Indemnities. [McDonnell Douglas] extends no warranty of any kind, express or implied, including any implied warranty of merchantability or suitability for purpose with respect to the PAM or with respect to services provided by [McDonnell Douglas] hereunder.* Except as provided in Articles 13, 15, 16, and 17 of this Agreement, under no circumstances will [McDonnell Douglas] be liable to Purchaser under or in connection with this Agreement, under any tort, negligence, strict liability, contract or other legal or equitable theory, for incidental or consequential damages or for Purchaser's cost of effecting cover. Purchaser shall indemnify and hold harmless [McDonnell Douglas], its officers, agents and employees from and against any and all liabilities, damages and losses, including costs and expenses in connection therewith, for death of or injury to any persons whomsoever and for the loss of, damage to or destruction of any property whatsoever, caused by, arising out of or in any way connected with the launch or operation of the PAM, Spacecraft, or Launch Vehicle unless resulting from the sole negligence or willful misconduct of [McDonnell Douglas], its officers, agents and employees. Purchaser hereby expressly waives and releases any cause of action or right of recovery which Purchaser may have hereafter against [McDonnell Douglas] for any loss or damage to the PAM, Spacecraft or Launch Vehicle, caused by, arising out of or in

any way connected with the launch or operation of the PAM, Spacecraft or launch vehicle. Purchaser shall obtain a waiver from any insurance carrier with which the Purchaser carries property insurance covering the PAM, Spacecraft and/or launch vehicle releasing its subrogation rights against [McDonnell Douglas]. Purchaser shall furnish [McDonnell Douglas] with certificates, satisfactory to [McDonnell Douglas], evidencing its compliance with its insurance obligations under this Article 7. The indemnification provisions of this Article 7 shall not apply to liabilities, damages or losses suffered under the conditions set forth in Article 14."

As Appalachian points out, article 7 does not expressly extend protection to subcontractors. Morton Thiokol acknowledges article 7 does not provide an explicit waiver applicable to subcontractors, but argues it was intended to benefit component suppliers: "Article 7 applies to the entire product, i.e., the PAM and its component parts. [Western Union] could have bargained for a warranty from [McDonnell Douglas] for the PAM and its component parts. Instead of paying an increased price, [Western Union] accepted a complete disclaimer." Morton Thiokol relies on the Ninth Circuit cases of *Aeronaves de Mexico, S.A.* v. *McDonnell Douglas* (9th Cir. 1982) 677 F.2d 771 and *Airlift Intern., Inc.* v. *McDonnell Douglas Corp.* (9th Cir. 1982) 685 F.2d 267. These cases are factually distinguishable and rest on the particular facts of the cases as the Ninth Circuit subsequently explained in *Continental Airlines* v. *Goodyear Tire & Rubber Co.* (9th Cir. 1987) 819 F.2d 1519.

As the Ninth Circuit explained in *Continental Airlines* v. *Goodyear Tire & Rubber Co., supra,* 819 F.2d at page 1528: "The reasoning in *Aeronaves* proceeded in this fashion. The court pointed out that the airline already had received from [McDonnell Douglas] over $400,000 worth of free servicing under its warranty provisions. To permit recovery by the airline from the parts suppliers for consequential damages would enable the parts suppliers thereafter to sue [McDonnell Douglas] for indemnity. The consequence would be that the airline would in effect circumvent the exculpatory clause and reap a 'windfall' of free repairs plus consequential damages. The crux of the matter, as *Aeronaves* saw it, was that the airline (by way of the exculpatory clause) had waived its consequential damage remedies in return for [McDonnell Douglas's] promise to provide valuable servicing of the component parts that allegedly caused the accident. The airline should not be permitted 'to have its cake and eat it too.' The situation in *Airlift* appears to have been the same.

"As Continental points out, however, the contractual provisions in this case differ in a significant respect. In *Aeronaves,* 'the warranty provisions . . . explicitly extend[ed] to components of the aircraft manufactured by

entities other than [McDonnell Douglas], regardless of who supplied the design specifications.' " (Citations omitted.)

Thus, the holdings of the *Aeronaves* and *Airlift* cases derived from (1) express language in an exculpatory clause which extended exculpation to component manufacturers and (2) on the existence of a servicing agreement for the seller's benefit. In the case here, there is no such express language in article 7 nor is there a similar servicing agreement extended to Western Union.

Article 7, however, is not the only exculpatory clause in the contract. The contract also contains article 14 which provides, in pertinent part: "14.2 Purchaser and [McDonnell Douglas] (the Parties) will respectively utilize their property and employees in STS Operations in close proximity to one another and to others. Furthermore, the parties recognize that all participants in STS Operations are engaged in the common goal of meaningful exploration, exploitation and uses of outer space. In furtherance of this goal, the parties hereto agree to a no-fault, no-subrogation, inter-party waiver of liability pursuant to which each party agrees not to bring a claim against or sue the other party, NASA, or other NASA customers and agrees to absorb the financial and any other consequences for Damage it incurs to its own property and employees as a result of participation in STS Operations during Protected STS Operations, irrespective of whether such Damage is caused by NASA, Purchaser, [McDonnell Douglas], or other NASA customers participating in the STS Operations, and regardless of whether such Damage arises through negligence or otherwise. Thus, the Parties, by absorbing the consequences of damage to their property and employees without recourse against each other, NASA, or other NASA Customers participating in STS Operations during Protected STS Operations, jointly contribute to the common goal of meaningful exploration of outer space.

"14.3 The parties agree that this common goal will also be advanced through extension of the inter-party waiver of liability to other participants in STS Operations. Accordingly, the parties agree to extend the waiver as set forth in Paragraph 14.2 above to their respective contractors and subcontractors at every tier, as third party beneficiaries, whether or not such contractors or subcontractors causing damage bring property or employees to a United States Government Installation or retain title to or other interest in property provided by them to be used, or otherwise involved, in STS Operations. Specifically, the parties intend to protect these contractors and subcontractors from claims, including 'products liability' claims, which might otherwise [be] pursued by the Parties, or the respective contractors or subcontractors of the Parties, or other NASA customers or the contractors

or subcontractors of other customers. Moreover, it is the intent of the parties that each will take all necessary and reasonable steps in accordance with Paragraph 14.5 below to foreclose claims for Damage by any participant in STS Operations during protected STS Operations, under the same conditions and to the same extent as set forth in Paragraph 14.2 above, except for claims between Purchaser and its other contractors or subcontractors and claims between [McDonnell Douglas] and its contractors and subcontractors.

"14.4 The parties intend that the inter-party waiver of liability set forth in Paragraph 14.2 and 14.3 above be broadly construed to achieve the intended objectives.

"14.5 Purchaser and [McDonnell Douglas] will each require the following to agree to the waiver of liability set forth in Paragraph 14.3 above: (i) all persons and entities to whom it assigns all or part of its right to Launch and Associated Services; (ii) any person or entity to whom it has sold or leased or otherwise agreed, prior to the completion of NASA's launch services for a particular Payload, to provide all or any portion of its Payload or Payload services; (iii) all its prime contractors; and (iv) all its subcontractors who will have persons or property involved in STS Operations during Protected STS Operations.

"14.6 Words or phrases capitalized but not defined in this Article 14, shall have the meaning attributed to such words or phrases in the NASA/Purchaser Launch Services Agreement for WESTAR VI.

"14.7 In the event NASA and Purchaser should modify any of the provisions entitled 'Damages to Persons or Property involved in STS Operation,' [the inter-party waiver] [McDonnell Douglas] and Purchaser agree to modify this Article 14, to conform to such modification."

Appalachian argues its suit is permitted by the "except" clause in paragraph 14.3. We disagree. That clause excepts "claims between [Western Union] and its *other* contractors and subcontractors . . . ." (Italics added.) Morton Thiokol and Hitco were not "other" contractors or subcontractors of Western Union; they were a contractor and subcontractor of McDonnell Douglas. As such, they were specifically extended protection by paragraph 14.3's language stating: (1) the interparty waiver of liability was extended to each parties' "*respective* contractors and subcontractors" and (2) the parties' intent was to protect "*these* contractors and subcontractors from claims, *including 'products liability' claims, which might otherwise [be] pursued by the Parties* . . . ." (Italics added.) To adopt Appalachian's argument would render this language, which lies at the heart of paragraph 14.3,

mere surplusage, a result to be avoided. (See *Estate of Newmark, supra,* 67 Cal.App.3d 350, 356.)

Appalachian contends article 14, and the "except" clause of paragraph 14.3 in particular, must be construed in light of the interparty waiver contained in the launch services agreement between NASA and Western Union.[4] Appalachian explains Western Union drafted article 14 for the sole purpose of complying with NASA's condition that space shuttle customers "flow down" the interparty waiver of liability contained in the launch services agreement to their prime contractors and subcontractors.[5] The interparty waiver of liability contained in the launch services agreement required space shuttle customers to agree not to sue NASA or other customers or the contractors or subcontractors of NASA or other customers for any loss occurring during space shuttle operations. The "flow down" provision of the launch services agreement's interparty waiver required space shuttle customers to obtain similar waivers of liability (i.e., agreements not to sue other customers, NASA or the contractors and subcontractors of

---

[4] The basic interparty waiver of liability in the launch services agreement provides: "NASA and the Customer (the parties) will respectively utilize their property and employees in STS Operations in close proximity to one another and to others. Furthermore, the parties recognize that all participants in STS operations are engaged in the common goal of meaningful exploration, exploitation and uses of outer space. In furtherance of this goal, the parties hereto agree to a no-fault, no subrogation, inter-party waiver of liability pursuant to which each party agrees not to bring a claim against or sue the other party or other customers and agrees to absorb the financial and any other consequences for Damage it incurs to its own property and employees as a result of participation in STS Operations during Protected STS Operations, irrespective of whether such Damage is caused by NASA, the Customer, or other customers participating in STS Operations, and regardless of whether such Damage arises through negligence or otherwise. Thus, the parties, by absorbing the consequences of damage to their property and employees without recourse against each other or other customers participating in STS Operations during Protected STS Operations, jointly contribute to the common goal of meaningful exploration of outer space."

[5] The section in the launch services agreement which is equivalent to paragraph 14.3 in the McDonnell Douglas/Western Union contract provides: "The parties agree that this common goal [of meaningful exploration of outer space] will also be advanced through extension of the inter-party waiver of liability to other participants in STS Operations. Accordingly, the parties agree to extend the waiver as set forth in Subparagraph 3.b. above to contractors and subcontractors at every tier of the parties and other customers, as third party beneficiaries, whether or not such contractors or subcontractors causing damage bring property or employees to a United States Government Installation or retain title to or other interest in property provided by them to be used, or otherwise involved, in STS Operations. Specifically, the parties intend to protect these contractors and subcontractors from claims, including 'products liability' claims, which might otherwise be pursued by the parties, or the contractors or subcontractors of the parties, or other customers or the contractors or subcontractors of other customers. Moreover, it is the intent of the parties that each will take all necessary and reasonable steps in accordance with Subparagraph 3.e. below to foreclose claims for Damage by any participant in STS Operations during Protected STS Operations, under the same conditions and to the same extent as set forth in Subparagraph 3.b. above, except for claims between the Customer and its contractors or subcontractors and claims between the United States Government and its contractors and subcontractors."

other customers and NASA for losses incurred during space shuttle operations) from the customers' prime contractors and subcontractors.[6]

Appalachian cites evidence indicating the interparty waiver of liability in the launch services agreement was not intended to preclude lawsuits like the one here, i.e., between a space shuttle customer and its own contractors and subcontractors. For example, Robert Wojtal, NASA's general counsel, in his deposition explained: "Well, essentially we drafted a clause that applied to the user, that is the customer who came in and purchased launch services, and it applied to anyone who continued to own property, for example the component on board the Shuttle, that is no—NASA would not sue him nor would another user sue that person who had that defective component, who manufactured the defective component and retained title to that defective component while on board the Shuttle."

When asked if the interparty waiver in the launch services agreement was intended to prohibit Western Union from suing Morton Thiokol "for the loss of its satellite caused by the exploding motor," Wojtal answered: ". . . The answer is yes. The user, the customer, could bring suit against his own contractor. There's nothing in the agreement which is intended to preclude that. In fact there's language in the agreement that was intended to permit the suit."

Appalachian also points to language in the NASA launch services agreement specifically allowing this suit against Western Union's contractor (McDonnell Douglas) and subcontractors (Morton Thiokol and Hitco). The "except" clause in the launch services agreement excepts from the general interparty waiver of liability "claims between the Customer and its contractors or subcontractors." Appalachian argues that since article 14.3 was modeled on the launch services agreement and because it contains nearly identical language as the launch services agreement, article 14 and the "except" clause of paragraph 14.3 should be construed as reflecting the same intent as the NASA/Western Union launch services agreement, i.e., permitting suits by Western Union against Morton Thiokol and Hitco.

The problem with this argument is that the language of the launch services agreement and the McDonnell Douglas/Western Union contract,

---

[6]The interparty waiver of liability in the launch services agreement was prompted by a concern that customers would be wary of using the space shuttle which could carry up to four satellites (as opposed to an expendable launch vehicle which carried only one satellite at a time) because of the potential liability problems, e.g., the possibility that one customer's payload, due to either NASA's fault or the fault of the customer or its contractors, could damage another customer's payload or the space shuttle. To eliminate this concern, NASA incorporated an interparty waiver of liability into all its launch services agreements and required all customers to waive claims against NASA, other customers and their respective contractors and subcontractors.

while similar, are not identical. There are significant differences in the wording of the two instruments. The McDonnell Douglas/Western Union contract specifically prohibits suits by the parties against each other's respective contractors and subcontractors, excepting only claims between Western Union and its "other" contractors and claims between McDonnell Douglas and its contractors and subcontractors. In contrast, the launch services agreement, an agreement between Western Union and NASA prohibits claims between NASA and the space shuttle's customers (and their contractors and subcontractors) and between space shuttle customers (and their contractors and subcontractors) but specifically excepts claims between a customer and its own contractors or subcontractors and between the United States Government and its contractors and subcontractors.

To ignore the differences in the language used in the two agreements would violate a fundamental rule of contract interpretation, that is, the words of a contract, if clear, must govern its interpretation. The words of the McDonnell Douglas/Western Union contract are clear; they unambiguously preclude a suit by Western Union against McDonnell Douglas's respective contractors and subcontractors, i.e., against Morton Thiokol and Hitco. The fact that the launch services agreement reflects a different intent does not render the McDonnell Douglas/Western Union contract ambiguous; the launch services agreement involves different parties, a different subject matter and different language. Appalachian's argument, based on importing language from a different agreement, is unpersuasive.[7]

## III

### Reformation

Appalachian contends article 14, as written, does not reflect the true intent of the parties which was to adopt only the interparty waiver as required by the launch services agreement between Western Union and NASA. ■ ■■ ■■ Appalachian argues article 14 should be reformed to reflect this "true agreement" of the parties.[8]

---

[7] Appalachian also argues the ambiguous nature of the McDonnell Douglas/Western Union contract is established by the trial court's finding the interparty waiver of liability in the launch services agreement was ambiguous. The ambiguity found by the trial court in the launch services agreement, however, related to a different issue—the question of McDonnell Douglas's status as a contractor relative to the federal government.

[8] Hitco contends Appalachian cannot raise the reformation issue because it failed to plead reformation or recision in its complaint. This contention is without merit. Reformation may be raised as a defense to the enforcement of a contract. (See *California Packing Corp.* v. *Larsen* (1921) 187 Cal. 610, 612 [203 P. 102].) Here, Appalachian raised the reformation issue as a defense to the respondents' summary judgment motions seeking to enforce the written contract.

■ As a general rule, a written contract, having been deliberately executed, is presumed to correctly express the parties' intentions. (*California Trust Co.* v. *Cohn* (1935) 9 Cal.App.2d 33, 40 [48 P.2d 744].) "The presumption is not conclusive and may be overcome by satisfactory evidence which shows that the written instrument is not in conformity with the true agreement of the parties." (*Ibid.*) Civil Code section 3399 allows reformation of a contract when, through mistake, it fails to express the true agreement of the parties. "[The] mistake may be the mutual error of both parties to the contract, or the oversight of one party which the other knew or suspected at the time of entering the agreement." (*American Home Ins. Co.* v. *Travelers Indemnity Co.* (1981) 122 Cal.App.3d 951, 961 [175 Cal.Rptr. 826].)

■ When reformation is sought, "the Court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be." (Civ. Code, § 3401; *First American Title Ins. & Trust Co.* v. *Cook* (1970) 12 Cal.App.3d 592, 598 [90 Cal.Rptr. 645].) Thus, "[t]he fact that the parties used the very words which they intended to use is not always sufficient cause for refusing relief of this character. There may be no mistake as to the words used or to be used, and at the same time there may have been a mutual mistake as to some other matter of fact affecting the meaning or application of the words, and by reason thereof the contract may not truly express the real intention of both parties, and in that case it may be revised and reformed at the instance of the aggrieved party and enforced accordingly, although the words were carefully chosen. [Citations.]" (*F.P. Cutting Co.* v. *Peterson* (1912) 164 Cal. 44, 47-48 [127 P. 163]; see also *Holmes* v. *Anderson* (1928) 90 Cal.App. 276 [265 P. 1010].)

■ Since reformation is an equitable remedy, it may be denied if the mistake was the result of " ' "the want of that degree of care and diligence which would be exercised by persons of reasonable prudence under the same circumstances . . . ." ' " (*Fraters G. & P. Co.* v. *Southwestern C. Co.* (1930) 107 Cal.App. 1, 6 [290 P. 45]; see also *Miller* v. *Lantz* (1937) 9 Cal.2d 544, 548 [71 P.2d 585] [reformation denied to defendant who failed to explain long delay in discovering the alleged defect in the writing, why he was precluded from reading or fully comprehending the meaning of the contract and language used and his cross-complaint showed only a unilateral mistake]; *Roller* v. *California Pacific Title Ins. Co.* (1949) 92 Cal.App.2d 149, 154 [206 P.2d 694] ["We are inclined to the view, therefore, that where the failure to familiarize one's self with the contents of a written contract prior to its execution is traceable solely to carelessness or negligence, reformation as a rule should be denied." (italics omitted)]; *Taff* v. *Atlas Assur. Co.* (1943) 58 Cal.App.2d 696, 702 [137 P.2d 483] ["The reformation of [an insurance policy] on the ground of mistake without the exercise of reason-

able care on the part of the insured is not to be encouraged."]; *Nelson* v. *Meadville* (1937) 19 Cal.App.2d 68 [64 P.2d 1116] [one seeking reformation must offer a satisfactory explanation for the failure to read or familiarize one's self with the terms of a contract].)

"If the written instrument accurately reflects the agreement of the parties, albeit an agreement based upon a mistaken assumption of fact, an action for reformation does not lie. [Citations.]" (*Getty* v. *Getty* (1986) 187 Cal.App.3d 1159, 1178 [232 Cal.Rptr. 603].) Finally, "[a]lthough a court of equity may revise a written instrument to make it conform to the real agreement, it has no power to make a new contract for the parties, whether the mistake be mutual or unilateral [citation]." (*Shupe* v. *Nelson* (1967) 254 Cal.App.2d 693, 700 [62 Cal.Rptr. 352]; *Stare* v. *Tate* (1971) 21 Cal.App.3d 432, 438 [98 Cal.Rptr. 264].)

Here, the evidence offered by Appalachian in support of reformation consists of (1) statements by the parties prior to the incorporation of article 14 into the contract of their intent to comply with the interparty waiver NASA would require in the launch services agreement,[9] and (2) the variance in the scope of the interparty waiver required by NASA in the launch services agreement (i.e., waivers of liability between NASA and the space shuttle customers and their respective contractors and subcontractors and among the space shuttle customers and their contractors and subcontractors) and the scope of the waiver contained in article 14 (i.e., waivers not only among Western Union and its contractors and subcontractors, NASA and other space shuttle customers but also waivers between Western Union and McDonnell Douglas and McDonnell Douglas's contractors and subcontractors).

This evidence is insufficient to support reformation. This evidence shows only that the parties intended to comply with NASA's requirement that space shuttle customers obtain an interparty waiver of liability relating to other customers, NASA, and the respective contractors and subcontractors

---

[9] The original contract between Western Union and McDonnell Douglas in March 1983 did not contain article 14; the parties signed the contract on the condition that "any provisions included in the launch services agreement between Western Union and NASA related to damages to persons or property involved in the STS operations will be incorporated in the contract between [McDonnell Douglas] and Western Union." At the time Western Union proposed inclusion of article 14, it noted "This is the current NASA Launch Services Agreement flow-down clause." In a deposition, Western Union's contracting officer, Cammarato, explained article 14 was intended "to comply with whatever requirements NASA had with regard to [the] inter-party waiver requirement." Cammarato's counterpart at McDonnell Douglas testified in a deposition that article 14 "was going to be whatever Western Union negotiated with NASA with respect to the interparty waiver in [the] launch services agreement." He further explained article 14 was added "Because it was our understanding that NASA wouldn't let us on the launch site without having agreed to an interparty waiver of liability. We had to get on the launch site to process the hardware."

so as to be able to launch the Westar VI satellite on the space shuttle. Article 14 certainly accomplishes this purpose. The fact that it acts to do more than the bare minimum required by NASA does not in and of itself establish the existence of a mistake so as to support a reformation. The parties may well have decided to extend the scope of the waiver exactly as reflected by the language used in article 14. The record here is silent as to the intended scope of the article 14 waiver. In the absence of any evidence showing a contrary intent, we must presume article 14, as written, reflects the intent of the parties.

■■■ Basic to a cause of action for reformation is a showing of a " 'definite intention or agreement on which the minds of the parties had met [which] pre-existed [and conflicted with] the instrument in question.' " (*Bailard* v. *Marden* (1951) 36 Cal.2d 703, 708 [227 P.2d 10]; see also *Treadaway* v. *Camellia Convalescent Hospitals, Inc.* (1974) 43 Cal.App.3d 189, 197 [118 Cal.Rptr. 341] ["Reformation, on the ground of mutual mistake, presupposes actual agreement (i.e., no mistake) between the contracting parties as to what they intend, . . ."].) The evidence offered by Appalachian does not establish the existence of a definite preexisting intention or agreement to which the written contract should be reformed.

Nor has Appalachian presented evidence explaining how the mistake occurred, i.e., to explain the alleged negligence in drafting article 14 or Western Union's failure to uncover the error. Western Union itself drafted the article and submitted it to McDonnell Douglas for approval. ■■■ While it is true a written contract may be reformed even though the party seeking reformation drafted it, the party seeking reformation must offer some excuse. (See *Roller* v. *California Pacific Title Ins. Co., supra,* 92 Cal.App.2d 149, 154.)[10] Here, Appalachian offered no excuse. For example, there is no claim (nor evidence showing) the "mistake" was caused by misrepresentations by McDonnell Douglas as to the language which should be used (*ibid.*), or was due to an oversight or due to an error of a scrivener (see *McClure* v. *Cerati* (1948) 86 Cal.App.2d 74 [194 P.2d 46]). Rather, the record reflects Western Union formally submitted article 14 as well as other amendments to the contract to McDonnell Douglas for approval and that McDonnell Douglas reviewed and accepted the interparty waiver as written by Western Union. There is no evidence in the record that during this review process either party did not conduct a careful review of the language or expressed any doubts as to the language chosen in article 14 and its possible failure to reflect the parties' "true" agreement. Indeed, even after

---

[10] In *Roller* v. *California Pacific Title Ins. Co., supra,* 92 Cal.App.2d 149, 154, the court stated: "Appellant's burden of explanation was much heavier since, as the court has found, he drew and prepared the contract. The language therein, attributable to himself, is now claimed by him to have caused his mistake. It was appellant's own proposal, already signed by him, which was presented to respondent for acceptance or rejection."

the failed launch here, when Western Union again reviewed the language of its contract and had an incentive to inform McDonnell Douglas of any error in article 14 as written, Western Union did not assert article 14 failed to reflect the agreement of the parties.[11]

In sum, what Appalachian seeks is not reformation of article 14 to reflect an agreement the parties had for a more limited waiver of liability which was not accurately reflected in article 14 as written. Rather, Appalachian seeks to create a new agreement for the parties, an agreement that Western Union might have made, but did not. This we cannot do. The trial court properly ruled against Appalachian on the reformation issue.

## IV

### Unconscionability

Appalachian contends articles 7 and 14 are not enforceable because both are unconscionable.

The doctrine of unconscionability is codified in Civil Code section 1670.5. Section 1670.5, in pertinent part, provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may . . . enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." ▇▇▇ The doctrine of unconscionability applies to all provisions of all contracts and has both a "procedural" and a "substantive" element. (*H.S. Perlin Co.* v. *Morse Signal Devices* (1989) 209 Cal.App.3d 1289, 1300-1301 [258 Cal.Rptr. 1].) As we explained in *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473 [186 Cal.Rptr. 114, 38 A.L.R.4th 1]: "The procedural element focuses on two factors: 'oppression' and 'surprise.' 'Oppression' arises from an inequality of bargaining power which results in no real negotiation and 'an absence of meaningful choice.' 'Surprise' involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms. Characteristically, the form contract is drafted by the party with the superior bargaining position.

"Of course the mere fact that a contract term is not read or understood by the nondrafting party or that the drafting party occupies a superior bargaining position will not authorize a court to refuse to enforce the contract. Although an argument can be made that contract terms not actively negotiated between the parties fall outside the 'circle of assent' which con-

---

[11] In an internal memorandum, Western Union concluded: "[Western Union] has no rights or obligations under this agreement in view of the failed launch."

stitutes the actual agreement, commercial practicalities dictate that unbargained-for terms only be denied enforcement where they are also *substantively* unreasonable. No precise definition of substantive unconscionability can be proffered. Cases have talked in terms of 'overly harsh' or 'one-sided' results. One commentator has pointed out, however, that, '. . . unconscionability turns not only on a "one-sided" result, but also on an absence of "justification" for it[,]' which is only to say that substantive unconscionability must be evaluated as of the time the contract was made. The most detailed and specific commentaries observe that a contract is largely an allocation of risks between the parties, and therefore that a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner. But not all unreasonable risk reallocations are unconscionable; rather, enforceability of the clause is tied to the procedural aspects of unconscionability such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated." (*Id*. at pp. 486-487, citations and fn. omitted.)

Appalachian contends the "procedural element" of unconscionability exists here because, Appalachian asserts, McDonnell Douglas "had an absolute monopoly on the sale of the PAM-D, which was essential for the launch of any commercial satellite in the United States," used that monopoly power to require all customers to accept the exculpatory clause which insulated McDonnell Douglas from liability and left Western Union with "no 'meaningful choice' other than to accept [McDonnell Douglas's] contractual terms." The record does not support these conclusions.

It is true that at the time Western Union sought to launch its Westar VI satellite, McDonnell Douglas was the only company supplying upper stage rockets for the space shuttle. To that extent, McDonnell Douglas had a monopoly. But, McDonnell Douglas did not have "an absolute monopoly" on the means of launching a telecommunications satellite into a geosynchronous orbit; owners of telecommunications satellites had the option of launching their satellites into geosynchronous orbit via the Ariane rocket of the European Space Agency. An Ariane launch did not require the purchase of an upper stage rocket from McDonnell Douglas. Here, Western Union, in fact, initially contracted with Arianespace to launch the Westar VI into geosynchronous orbit. Western Union terminated that contract, not because Arianespace was unavailable, but because Western Union decided the space shuttle presented a more reliable and cheaper option. Thus, contrary to Appalachian's contention, McDonnell Douglas had no monopoly vis-à-vis the means of launching satellites into geosynchronous orbits.

Appalachian contends McDonnell Douglas used oppressive negotiating practices and cites evidence of NASA's concerns about McDonnell Douglas's contracting practices.

Appalachian, in particular, cites a July 1983 letter from James Abrahamson, NASA's association administrator for space flight, responding to McDonnell Douglas's request for an increase in the ceiling price. In the letter, Abrahamson noted NASA had "received a series of major customer complaints about [McDonnell Douglas's] contractual approach" and stated "it has become increasingly clear that there are significant incompatibilities between the NASA Launch Services Agreement and the [McDonnell Douglas] contract." Abrahamson explained: "To insure there is no misunderstanding, I would like to emphasize that customer complaints are not directed at [McDonnell Douglas's] performance, the PAM-D as a system, or [McDonnell Douglas's] dedication and commitment to customer satisfaction. Both our customers and NASA are delighted with each of those important areas of performance. We are gratified that our partnership has worked so well for the Space Transportation System and our customers to this point.

"However, our new customers are gravely concerned with your contracting approach. They complain that there is no apparent willingness, on the part of [McDonnell Douglas], to undertake responsibilities normally agreed to in the aerospace payload industry; e.g., responsibility for hardware performance, for late delivery of the hardware, for acknowledging equity to the customer in the case of termination, and for granting access to technical information . . . ."

Abrahamson disapproved McDonnell Douglas's requested increase in the ceiling price at that time, but added he "would be pleased to continue the discussion within the broader content of both price and an acceptable customer contractual approach . . . ."

This letter, however, does not tell the whole story. After the letter, as a result of pressure from NASA and Western Union, McDonnell Douglas gave additional concessions to Western Union. Thus, Western Union was not the victim of allegedly oppressive contracting practices by McDonnell Douglas; McDonnell Douglas responded to the complaints and yielded to the bargaining power of Western Union and NASA. Moreover, as to article 14, the record is clear this provision was neither drafted nor insisted upon by McDonnell Douglas, but was drafted by Western Union and agreed to by both parties.

As to the second factor of procedural element of unconscionability—"unfair surprise"—Appalachian does not assert any unfair surprise occurred here nor would the record support such an assertion. The record shows Western Union was well aware of article 7. It had dealt with similar provisions in earlier contracts with McDonnell Douglas and in this contract

negotiated changes in the article. As to article 14, surprise cannot be claimed since Western Union itself drafted the provision.

Appalachian argues there is "substantive" unconscionability present here. Appalachian asserts the disclaimers are not "consistent with aerospace industry practice," explaining "[n]ormally, [Western Union] obtains warranties from its vendors." The evidence in the record fails to support Appalachian's assertion.

The citations are to testimony by Western Union contracting officer Anthony Cammarato addressing a different matter, i.e., Western Union's general policy when purchasing existing goods and services and, in particular, Western Union's use of printed purchase order forms containing a standard warranty for most procurements. Appalachian ignores Cammarato's later deposition testimony addressing the specific contract and warranty disclaimer here at issue. Cammarato stated it was "a standard way of doing business in the industry." Cammarato explained McDonnell Douglas did not agree to the warranty "because it's a high risk business," Western Union did not make any complaints about McDonnell Douglas's "take it or leave it" contracting attitude, and that Western Union's rationale for not seeking a warranty was "there's no such thing as a free lunch, and even if [McDonnell Douglas] would agree [to a warranty], there would be a charge."[12] Appalachian also ignores evidence showing article 14 was drafted to comply with the interparty waiver in the launch services agreement, a condition imposed by NASA, rather than McDonnell Douglas.

Appalachian asserts the disclaimers were not a "commercially reasonable allocation of risk." To support its position, Appalachian relies on language in *A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d 473, where we stated that "[f]rom a social perspective, risk of loss is most appropriately borne by the party best able to prevent its occurrence. [Citations.] Rarely

---

[12] In support of its position that the exculpatory provisions were unconscionable, Appalachian also submitted hearsay statements made by Cammarato and another contracting officer, F. William Ziegler, to Appalachian's attorney. Appalachian's attorney, in a declaration, stated these individuals had told him McDonnell Douglas was clear it "was not about to deviate" from the standard contract and that "there was very little to negotiate because the contract basically was offered on a take-it-or-leave-it basis."

Appalachian states the Western Union contracting officials changed their position after McDonnell Douglas threatened to sue Western Union unless Western Union stopped Appalachian's lawsuit. Appalachian explains: "[McDonnell Douglas] did file a cross-complaint against [Western Union] in this action seeking indemnification from [Western Union] for all of [McDonnell Douglas's] defense costs. As a result of [McDonnell Douglas's] actions, [Western Union] ceased its cooperation with plaintiffs in the prosecution of this case despite its obligation to do so under its insurance agreement with plaintiffs. . . . As Commissioner Bauer put it during an earlier hearing in this case, [McDonnell Douglas] 'terrorized' [Western Union] into a posture of noncooperation with plaintiffs. . . . It is not surprising, therefore, that the [Western Union] witnesses were less than forthcoming at their depositions." (Citations omitted.)

would the buyer be in a better position than the manufacturer-seller to evaluate the performance characteristics of a machine." (*Id.* at pp. 491-492.) Appalachian asserts this case fits within the guidelines of the *A & M Produce* case because "[i]t is beyond dispute that [MCDONNELL DOUGLAS], MORTON THIOKOL and HITCO were in a better position than [WESTERN UNION] to prevent the exit cone failure that occurred in this case."

Appalachian's argument is overly simplistic. If unconscionability could be established merely by showing the manufacturer-seller's superior ability to detect defects, then the general rule would be that disclaimers were unconscionable and illegal. ▮ Warranty disclaimers, however, are specifically authorized by the California Uniform Commercial Code (see Cal. U. Com. Code, § 2316) and the Supreme Court has held "no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party." (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

Further, Appalachian's reliance on our decision in *A & M Produce* is misplaced; Appalachian ignores the factual context of that case. *A & M Produce* involved the sale of a mass-produced product by "an enormous diversified corporation" to "a relatively small but experienced farming company" using a standardized preprinted form with a warranty disclaimer printed on the reverse side which was never read by the buyer. (*A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d 473, 489-491.) In this factual context, we stated that "[I]t is patently unreasonable to assume that a buyer would purchase a standardized mass-produced product from an industry seller without any enforceable performance standards." (*Id.* at p. 491.) We also observed: "Especially where an inexperienced buyer is concerned [the buyer here was venturing into a new area, was unfamiliar with the equipment and turned to the seller's agent for recommendations as to what equipment was necessary], the seller's performance representations are absolutely necessary to allow the buyer to make an intelligent choice among the competitive options available. A seller's attempt, through the use of a disclaimer, to prevent the buyer from reasonably relying on such representations calls into question the commercial reasonableness of the agreement and may well be substantively unconscionable." (*Id.* at p. 492.)

Here, the contract was not a standardized printed form for the sale of a mass-produced product; here the contract was negotiated. It involved specialized services and new technology developed in a "high risk business." Western Union was not an inexperienced buyer who had to rely on McDonnell Douglas's representations; Western Union was a large, sophisticated corporation experienced in launching telecommunications satellites. West-

ern Union was further given periodic progress reports, including reports of two test failures of the Star 48 motor.

In this context, of a highly specialized, risky new technology, it was not commercially unreasonable for the parties to agree Western Union would obtain insurance to protect it against the risk of loss rather than to have McDonnell Douglas warrant performance of the upper stage rocket. As a practical matter, it was a question of whether Western Union wanted to directly pay for insurance by obtaining insurance itself or indirectly pay for insurance by requiring McDonnell Douglas obtain the insurance and give a warranty.[13] It was reasonable for Western Union to agree to obtain its own insurance directly rather than to pay an increased contract price which would include McDonnell Douglas's costs in administering the insurance for Western Union's benefit. We do not find any unconscionability existing in articles 7 and 14 of the Western Union and McDonnell Douglas contract.

## V

### *Public Interest*

Appalachian contends articles 7 and 14 are unenforceable because they affect the public interest.

In *Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 96, the Supreme Court held that exculpatory provisions which "involve 'the public interest'" are unenforceable. The *Tunkl* court identified six characteristics "which have been held to stamp a contract as one affected with a public interest." (*Id.* at p. 98.) These characteristics are: "[1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person

---

[13] A contracting official at McDonnell Douglas stated during a deposition: "I remember having discussions with Mr. Herbert of RCA with regards to that. And discussion was of the nature as to providing—them providing insurance as opposed to us providing insurance and having to charge them for the same insurance and having to put an overlay on top of it."

or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id*. at pp. 98-101, fns. omitted.)

Appalachian contends all six of the *Tunkl* factors are present in this case.

### (1) Public Regulations

Appalachian argues this factor is satisfied "by the regulations that govern both domestic satellite owners' use of communications satellites and the sale of upper stage boosters by domestic suppliers like [McDonnell Douglas]." Appalachian points to the regulations by the Federal Communications Commission (FCC) and state authorities on satellite communications for the protection of the public and NASA's regulation of customer procurements of McDonnell Douglas's upper stage rocket (e.g., the ceiling price on the PAM and launch related services).

Appalachian's reliance on these regulations to meet the *Tunkl* criteria is misplaced. First, the NASA "regulations" are not legislative enactments or agency regulations, they are terms in a contract between NASA and McDonnell Douglas. The terms are related to the price of the upper stage rocket and launch related services and were added, not for the protection of the general public, but to insure NASA's space shuttle would remain competitively priced with the Ariane rocket of the European Space Agency.

As to the state and FCC regulations cited by Appalachian, these relate to satellite transmissions rather than the sale of hardware and services for launching satellites.

The "public regulations" factor is intended to focus the court's attention on the question of whether the exculpatory clause will adversely affect a public interest demonstrated by the presence of regulations. As the court explained in *Delta Air Lines, Inc.* v. *Douglas Aircraft Co.* (1965) 238 Cal.App.2d 95 [47 Cal.Rptr. 518], a case involving an exculpatory clause in a contract for sale of an aircraft: "The fact that Delta is a regulated enterprise and carries passengers has no relevance to the present decision. The upholding of the exculpatory clause will not adversely affect rights of future passengers [i.e., the general public affected by the regulations]. They are not parties to the contract and their rights would not be compromised. They retain their right to bring a direct action against [McDonnell] Douglas for negligence. [Citation.] Also, their right to bring an action against [McDonnell] Douglas for breach of implied warranty would not be interfered with because the passengers were not a party to the contract containing the exculpatory clause." (*Id*. at p. 104, fn. omitted.)

Similarly, here, the rights of the public are not affected by the exculpatory clause in the Western Union/McDonnell Douglas contract. The rights of

the public as protected in the regulations cited by Appalachian are unaffected by the parties' agreement that Western Union should obtain insurance to protect against potential loss rather than to look to McDonnell Douglas for a warranty.

### (2) Practical Necessity

Appalachian argues: "[This factor] is present here because PAM-Ds provide a critical link in the establishment of domestic and international telecommunication systems. Common carriers like [Western Union] that launch commercial satellites provide vital communication services to the public, including the transmission of telephone, data transmission, and video (television) signals. The PAM-D is, of course, necessary for the launch of commercial satellites."

Appalachian misapprehends the nature of this factor. This factor looks to services such as medical, legal, housing, transportation or similar services "which must *necessarily* be used by the general public." (*Hulsey* v. *Elsinore Parachute Center* (1985) 168 Cal.App.3d 333, 343 [214 Cal.Rptr. 194] [italics in original]; *Okura* v. *United States Cycling Federation* (1986) 186 Cal.App.3d 1462, 1467 [231 Cal.Rptr. 429]; *Cohen* v. *Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 655 [191 Cal.Rptr. 209].)

The provision of hardware and service for space launches, obviously, is not similar to these basic, necessary services; it is not the type of service "which is often a matter of practical necessity for some members of the public." (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 99.) Appalachian points out that it is not necessary that the service be of practical necessity to all members of the public; it is sufficient if it is of practical necessity to *some* members. Here, however, the provision of space hardware and launch services is of practical necessity to no individual member of the public; it is of "practical necessity" only to a few, very large commercial and governmental entities dealing in highly specialized fields such as telecommunications.

### (3) Service is Open to Any Member of the Public

Appalachian argues: "The third *Tunkl* characteristic is present here because [McDonnell Douglas] was willing to sell the PAM-D to any public or private entity, so long as the potential customer could afford the prices charged for the PAM-D."

Appalachian's attempt to minimize the exclusivity of the sales of the upper stage rocket by characterizing it only as a matter of being able to afford the sales price is hardly a persuasive argument. The high price of obtaining the service, in and of itself, precludes nearly all members of the

public from obtaining the service. The record shows 10 sales of the upper stage rocket. None of the sales were to an individual member of the general public; all were to large, sophisticated commercial and governmental entities. Further, the contract here involved not only the sale of space hardware, but also the provision of launch related services. We seriously doubt NASA was making space shuttle launches available to the general public.

### (4) Essential Nature of Service, Economic Setting and Bargaining Power

To support the presence of this factor, Appalachian points to the "monopoly" McDonnell Douglas had on the supply of upper stage rockets for the space shuttle and stresses the "essential nature" of this product for launching telecommunication satellites.

As discussed in section III above, Western Union, in seeking to launch its Westar VI satellite was not presented with a situation where it was compelled to purchase McDonnell Douglas's product or forgo launch of its satellite; Western Union had the option of launching its satellite via the Ariane rocket which did not require the purchase of a PAM from McDonnell Douglas. Second, while the service provided by McDonnell Douglas may have been "essential" to Western Union once Western Union decided to use the space shuttle, it was not the kind of "essential" service referred to by the Supreme Court in *Tunkl*. *Tunkl*'s focus was on whether the service was "essential" to individual members of the public. Here, the service is "essential" only to a small number of large corporations and governmental entities; it "is not a compelled, essential service" but "a voluntary relationship between the parties." (*Okura* v. *United States Cycling Federation, supra*, 186 Cal.App.3d 1462, 1468.) Finally, this case does not involve a "decisive advantage of bargaining strength [used] against any member of the public who seeks [the] services." (*Tunkl* v. *Regents of University of California, supra*, 60 Cal.2d 92, 100.) This case does not involve a large entity using its bargaining strength against an individual member of the public. This case involves two large, sophisticated corporations with relatively equal bargaining power who negotiated the terms of a voluntary agreement.[14]

### (5) Standardized Adhesion Contract

The contract here was not a standardized adhesion contract. The contract here was the product of negotiations between the parties and the exculpatory clauses (providing the parties would obtain their own insurance

---

[14] It has also been noted: "The relative bargaining strengths of the parties does not come into play absent a compelling public interest in the transaction." (*Okura* v. *United States Cycling Federation, supra*, 186 Cal.App.3d 1462, 1468.)

to cover potential losses and would not make claims against each other) were the result of a voluntary agreement.

### (6) Property Subject to Seller's Control

Appalachian argues this factor is present here because the ". . . Westar [VI], in the critical period after deployment from the Space Shuttle, was solely and exclusively controlled by the PAM-D Star 48 motor."

This argument is without merit. Once the satellite was placed in the space shuttle, McDonnell Douglas no longer had control; the satellite and the PAM were under NASA's control. McDonnell Douglas did not suddenly regain control of Westar VI and the PAM by its deployment from the space shuttle.

### Conclusion

We conclude, the exculpatory clauses here do not conflict with the public interest, but were the result of "private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party." (*Tunkl* v. *Regents of University of California, supra,* 60 Cal.2d 92, 101.) We find pertinent here to both Appalachian's claim based on the public interest as well as its claim based on unconscionability the reasoning of the court in *Philippine Airlines, Inc.* v. *McDonnell Douglas Corp.* (1987) 189 Cal.App.3d 234 [234 Cal.Rptr. 423], a case involving the sale of an allegedly defective aircraft by McDonnell Douglas. The court there stated: "Each of these theories might be asserted in *any* action involving an allocation of risk, yet, as discussed, contractual allocations of risk in nonconsumer commercial settings are routinely upheld. The reason, we think, lies with our laws of negligence and products liability, and with the economic realities of the marketplace. It may be true, as PAL argues, that the ultimate consumer—here the passenger—is provided with a streamlined remedy against the carrier. Given, however, the realities of litigation, and the possibility that a carrier might have insufficient resources to cover what might be extensive liability should an aircraft malfunction, it would make little economic sense for a manufacturer to place on the market a defective product on the belief that it somehow would be insulated from the personal injury claims of passengers. Moreover, and aside from its potential liability to passengers, a manufacturer whose defective products caused its customers to be sued would not long remain in business. And a manufacturer such as [McDonnell Douglas] is still answerable to the Federal Aviation Commission. We are thus of the opinion that the argued 'disincentive' to produce a safe aircraft resulting

from a finding that the disclaimer of liability at issue is valid, is largely illusory." (*Id.* at p. 242, italics in original, fn. omitted.)[15]

We conclude the trial court correctly rejected Appalachian's argument the exculpatory clauses in the Western Union/McDonnell Douglas contract were affected with the public interest.

## VI

### *Strict Liability*

Appalachian contends articles 7 and 14 are unenforceable to the extent they attempt to bar claims for strict liability. Appalachian contends strict liability may not be contractually disclaimed. While we agree with Appalachian that there are cases holding strict tort liability cannot be contractually disclaimed, we disagree with Appalachian's conclusion that the waivers here are unenforceable. Appalachian's argument rests on the faulty premise that strict liability theory applies in this commercial setting.

 Under the strict liability doctrine, "[a] manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury . . . ." (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) Strict liability theory was adopted because sales warranty theory, developed to meet the needs of commercial transactions and requiring a showing of privity, was inadequate to protect consumers. (*Kaiser Steel Corp.* v. *Westinghouse Elec. Corp.* (1976) 55 Cal.App.3d 737, 746-747 [127 Cal.Rptr. 838].) "The doctrine of manufacturers' and suppliers' strict liability in tort was developed primarily to protect *individual consumers,* users, and, to some extent, by-standers who are in no position to protect themselves from defective products" rather than to protect commercial entities. (*U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 18 [112 Cal.Rptr. 18], italics added.) In accord with the underlying purpose of the strict liability doctrine (to provide a

---

[15] See also *Delta Air Lines, Inc.* v. *Douglas Aircraft Corp., supra,* 238 Cal.App.2d 95, also involving the sale of an allegedly defective aircraft and an attempt to avoid the effect of an exculpatory clause. The *Delta* court, in upholding the exculpatory clause, stated: "In short, all that is herein involved is the question of which of two equal bargainers should bear the risk of economic loss if the product sold proved to be defective. Under the contract before us, Delta (or its insurance carrier if any) bears that risk in return for a purchase price acceptable to it; had the clause been removed, the risk would have fallen on [McDonnell] Douglas (or its insurance carrier if any), but in return for an increased price deemed adequate by it to compensate for the risk assumed. We can see no reason why Delta, having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to [McDonnell] Douglas, which had neither agreed to assume it nor been compensated for such assumption." (*Id.* at pp. 104-105, fn. omitted.)

remedy for injuries to consumers injured by defective products when contractual theories were inadequate), it has been held strict liability cannot be contractually disclaimed in the consumer context. As the Supreme Court explained in *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 17 [45 Cal.Rptr. 17, 403 P.2d 145], "[strict] liability [cannot] be disclaimed, for one purpose of strict liability in tort is to prevent a manufacturer from defining the scope of his responsibility for harm caused by his products." (See also *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], ["Regardless of the obligations it assumed by contract, it is subject to strict liability in tort because it is in the business of selling automobiles, one of which proved to be defective and caused injury to human beings."].)

In contrast, when a lawsuit over a defective product arises in a commercial setting and involves only a business loss, the courts hold strict liability theory is not available; the parties are limited to normal commercial remedies (e.g., the California Uniform Commercial Code or their contracts). The cases reason strict liability theory should not apply to a commercial transaction because: commercial entities are not " 'in such a vulnerable position' " as are consumers (see *Sumitomo Bank* v. *Taurus Developers, Inc.* (1986) 185 Cal.App.3d 211, 227 [229 Cal.Rptr. 719]; *U. S. Financial* v. *Sullivan, supra,* 37 Cal.App.3d 5, 18-19); commercial entities can bargain for "a product designed to negotiable specifications and not furnished off the shelf" (see *Kaiser Steel Corp.* v. *Westinghouse Elec. Corp., supra,* 55 Cal.App.3d 737, 748); and because application of a strict liability theory "would improperly invade rules of law adopted by the Legislature in the California Uniform Commercial Code" when the California Uniform Commercial Code regulates "the various aspects of plaintiff's purchase of [the product] from defendant, including liability for defects based on express and implied warranties" (*Sacramento Regional Transit Dist.* v. *Grumman Flxible* (1984) 158 Cal.App.3d 289, 294-295 [204 Cal.Rptr. 736]).

Since liability for defective products when commercial entities and a business loss are involved is governed by the California Uniform Commercial Code which allows disclaimers of warranties (see Cal. U. Com. Code, § 2316) and by the parties' agreement, liability for defects may be disclaimed; the tort theory of strict liability does not apply and thus does not bar the disclaimer. The trial court properly ruled the disclaimers of strict liability in the Western Union/McDonnell Douglas contract were effective.

## VII

### New Trial Motion

Appalachian contends the trial court erred in denying its motion for a new trial based on newly discovered evidence—a warranty from Morton

Thiokol running in favor of Western Union. The trial court denied Appalachian's motion on the ground that nothing had been presented which would cause the court to change its ruling.

This warranty from Morton Thiokol provided: "Seller [Morton Thiokol] warrants the articles delivered hereunder to be free from defects in labor, material and manufacture and to be in compliance with any drawings or specifications incorporated or referenced herein and with any samples furnished by the Seller. *All warranties shall run to [McDonnell Douglas]*, its successors, and assigns and to *its customers and the users of its products.*" (Italics added.)

Appalachian argues it may enforce this warranty despite the fact there is no evidence indicating Western Union was aware of it at the time Western Union negotiated the purchase of the PAM. Appalachian contends the disclaimers and waivers contained in the contract between Western Union and McDonnell Douglas are insufficient to negate the express warranty from Morton Thiokol.

 To support its position, Appalachian relies on the general rule that express warranties take precedence over attempted disclaimers. This rule is codified in California Uniform Commercial Code section 2316 which provides attempts to negate or limit express warranties shall be "inoperative to the extent that such construction is unreasonable."[16] In the comment to section 2316, it is explained: "1. This section is designed principally to deal with those frequent clauses in sales contracts which seek to exclude 'all warranties, express or implied.' It seeks *to protect a buyer from unexpected and unbargained language of disclaimer* by denying effect to such language when inconsistent with language of express warranty and permitting the exclusion of implied warranties only by conspicuous language or other circumstances which *protect the buyer from surprise.*" (Italics added.)

Here, because there was no evidence indicating Western Union was aware of or relied on the warranty from Morton Thiokol when Western Union purchased the PAM, it cannot be said the disclaimer language in the written contract with McDonnell Douglas was "unexpected," "unbargained for" or a "surprise" since Western Union negotiated the language contained in article 7 and itself drafted article 14 which waived claims against McDonnell Douglas's contractors and subcontractors, including claims against Morton Thiokol.

---

[16] California Uniform Commercial Code section 2316 provides: "(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this division on parol or extrinsic evidence (Section 2202) negation or limitation is inoperative to the extent that such construction is unreasonable."

Appalachian's reliance on *A & M Produce Co.* v. *FMC Corp., supra,* 135 Cal.App.3d 473 and *Fundin* v. *Chicago Pneumatic Tool Co.* (1984) 152 Cal.App.3d 951 [199 Cal.Rptr. 789] is similarly misplaced. Both cases involve situations where the seller attempted to disclaim warranties in a written contract after having made *express* warranties to the buyer (by the seller's representative in *A & M Produce Co.;* by a brochure in *Fundin*). In both cases, the buyers *relied* on the seller's representations in purchasing the product. In both cases the express warranties directly contradicted disclaimers in the written contract which were *unbargained for.* As the court explained in *Pisano* v. *American Leasing* (1983) 146 Cal.App.3d 194, 197-198 [194 Cal.Rptr. 77]: "In the absence of any affirmations of fact or promises made by defendants to plaintiff, plaintiff cannot recover damages under his theory of breach of express warranty. [Citations.] In order to establish an express warranty, plaintiff must demonstrate that defendants' statements of fact or opinion were *the basis of the agreement . . . .* [Citations.] Plaintiff concedes that no such representations were made. Therefore, the summary judgment on his claim of breach of express warranty of fitness was properly granted." (Italics added.)

The critical flaw in Appalachian's argument is its failure to show the warranty from Morton Thiokol ever formed a " 'part of the basis of the bargain.' " (See *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 115 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.L.R.3d 1282] ["The key (to the existence of an express warranty) is that the seller's statements—whether fact or opinion—must become 'part of the basis of the bargain.' "].) Since Appalachian has failed to show any warranties, including the warranty from Morton Thiokol, formed a basis of Western Union's bargain for the PAM purchase, there is no basis for limiting or negating the exculpatory clauses and disclaimers in Western Union's written agreement with McDonnell Douglas. Limitations or negations of warranties are construed as inoperative only "to the extent that such construction is unreasonable." (Cal. U. Com. Code, § 2316, subd. (1).) Here there is nothing unreasonable in enforcing the limitations and disclaimers Western Union negotiated and agreed to in its contract with McDonnell Douglas because those limitations and disclaimers formed the sole basis of the parties' agreement.

The trial court correctly denied Appalachian's motion for a new trial.[17]

---

[17]Morton Thiokol also argues Appalachian's motion for a new trial was properly denied because Appalachian failed to excuse its failure to earlier discover the warranty. Because we have held the warranty did not form a basis of Western Union's bargain and therefore is not enforceable by Appalachian we need not address Morton Thiokol's argument Appalachian failed to establish its diligence in discovering the warranty. We note, however, that in light of Morton Thiokol's and McDonnell Douglas's earlier denials of the existence of any express warranties from Morton Thiokol, the voluminous documentation involved in this case, Morton Thiokol's late disclosure of some documents and the difficulty of tracing the contract reference numbers, Morton Thiokol's argument seems somewhat disingenuous.

CROSS APPEAL

I

*Negligence Cause of Action*

The respondents contend the trial court erred in failing to additionally grant summary judgment as to Appalachian's cause of action for negligence. The respondents advance various theories why a negligence cause of action does not lie here, including assertions that a manufacturer in a commercial relationship has no duty under a negligence theory to prevent a product from injuring itself; that there is no recovery in tort for purely "economic losses"; that recovery under a negligence theory requires damage caused by "a violent or calamitous occurrence"; and that applying California tort law to allow recovery here would violate various federal laws and international treaties relating to outer space. Regardless of the merit or lack of merit to these arguments, we need not address them since we have held Western Union specifically waived this claim in the contract it signed with McDonnell Douglas.

II

*Statute of Limitations*

The respondents contend the trial court erred in determining Appalachian's action was not barred by the two-year statute of limitations of section 339, subdivision 1 of the Code of Civil Procedure.

Here, all parties agree the limitation period began to run on February 3, 1984, when the upper stage rocket failed to launch the Westar VI satellite into a geosynchronous orbit. On January 17, 1986, Appalachian filed a complaint against McDonnell Douglas, Morton Thiokol and Hitco seeking recovery based on negligence and strict liability in Orange County Superior Court. On February 14, 1986, McDonnell Douglas petitioned to remove the case to federal court on the ground, inter alia, that Appalachian's complaint raised a federal question and Appalachian's claims were preempted by federal law. On February 18, Appalachian, rather than petitioning for remand to the superior court, dismissed its action. McDonnell Douglas opposed the dismissal and filed a motion to strike or vacate Appalachian's dismissal. The following day, February 19, 1986, Appalachian filed an action containing essentially the same allegations against McDonnell Douglas, Morton Thiokol and Hitco in Orange County Superior Court.

On March 24, 1986, the federal court ruled on McDonnell Douglas's motion to strike or vacate Appalachian's dismissal. In ruling against Mc-

Donnell Douglas, the federal court judge stated: "Whether a dismissal under [Federal Rule of Civil Procedure] 41(a)(1)(i) may be set aside is an open question which the Court need not reach, since the Court has satisfied [itself] that the actions were not removable in the first place.

"......................

"On the basis that the causes of action asserted by the plaintiff do not depend upon a federal law element, the Court determines that the case does not 'arise under' federal law and was thus not removable. Had plaintiff not already dismissed the cases, they would have been remanded to the Superior Court.

"The plaintiffs having dismissed the actions, nothing remains to be done but deny the motion to strike the dismissal."

The respondents, in superior court, brought motions for summary judgment on the ground Appalachian's complaint was filed after the statute of limitations period had expired. The trial court denied the motions, ruling the complaint was timely filed within the two-year limitation period of Code of Civil Procedure section 339, subdivision 1 pursuant to the equitable tolling doctrine.

Appalachian first contends the applicable statute of limitations is not the two-year limitation period provided for in Code of Civil Procedure section 339, subdivision 1 but the three-year period of Code of Civil Procedure section 338, subdivision 3.[18]

Section 339, subdivision 1 imposes a two-year limitation on all actions on "obligation or liability not founded upon an instrument of writing." It has been construed to cover actions based on negligent wrongs not involving damage to real or tangible personal property and all actions seeking recovery for economic loss. (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 440, p. 470; *Richardson* v. *Allstate Ins. Co.* (1981) 117 Cal.App.3d 8 [172 Cal.Rptr. 423]; *People* v. *Wilson* (1966) 240 Cal.App.2d 574 [49 Cal.Rptr. 792].)

Section 338, subdivision 3 imposes a three-year limitation on "[a]n action for . . . injuring any goods . . . ." This section has been construed to cover negligent damage to tangible personal property. (See *Jones* v. *Russ Davis Ford* (1967) 247 Cal.App.2d 725 [56 Cal.Rptr. 18] [damage to automobile].)

The parties disagree here as to whether Appalachian is seeking recovery for any physical damage to the satellite caused by failure of the Star 48

---

[18] In 1988, the Legislature changed the subdivision designations from numerical to alphabetical in section 338 of the Code of Civil Procedure. Thus, subdivision 3 of section 338 is now subdivision (c).

motor. The respondents contend: "What is involved in the instant case is not conversion of or damage to the satellite, but the intangible right to have the satellite in a particular orbit." The respondents, therefore, assert the two-year limitation period of Code of Civil Procedure section 339, subdivision 1 applies. We need not resolve their dispute since, even assuming the shorter two-year statute applies, the trial court correctly found the action not barred. The trial court agreed with the respondents but applied the equitable tolling doctrine to the period when Appalachian's case was pending in federal court. The respondents contend the court erred in applying the doctrine.

 The "equitable tolling" doctrine is a judicially created doctrine designed to prevent unjust and technical forfeitures of the right to a trial on the merits when the purpose of the statute of limitations—timely notice to the defendant of the plaintiff's claims—has been satisfied. (See *Elkins* v. *Derby* (1974) 12 Cal.3d 410, 417-420 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839].) The doctrine was first applied by the California Supreme Court in *Bollinger* v. *National Fire Ins. Co.* (1944) 25 Cal.2d 399 [154 P.2d 399]. In *Bollinger,* the plaintiff filed a complaint against an insurance company but, after the limitations period contained in the plaintiff's insurance policy had expired, the trial court erroneously granted a nonsuit on the ground the plaintiff's action had been prematurely filed. Thereafter, when the plaintiff attempted to file a new complaint, the insurance company filed a demurrer, contending the complaint had been filed after the limitations period had expired. The trial court agreed, sustained the insurance company's demurrer without leave to amend and dismissed the complaint. The Supreme Court reversed.

The starting point of the Supreme Court's analysis was Code of Civil Procedure section 355 which provided: "If an action is commenced within the time prescribed therefor, and a judgment therein for the plaintiff be reversed on appeal, the plaintiff, or if he die and the cause of action survive, his representatives, may commence a new action within one year after the reversal." The Supreme Court traced the derivation of this statute through the New York Code of Civil Procedure back to the English Limitation Act of 1623. The court noted: "The wording of section 355 is reminiscent of the old English statutes that specified situations instead of formulating general rules. As presently worded it protects a plaintiff who has mistaken his remedy if he was awarded a judgment in the first instance and defeated on appeal. There is all the more reason to protect a plaintiff, as in the present case, who has not mistaken his remedy but through error of the trial court was not allowed to proceed to trial. The basic policy that underlies section 355 calls for relief in such a case." (*Bollinger* v. *National Fire Ins. Co., supra,* 25 Cal.2d at pp. 409-410.)

The *Bollinger* court stated it was "not powerless to formulate rules of procedure where justice demands it" and "has shown itself ready to adapt rules of procedure to serve the ends of justice where technical forfeitures would unjustifiably prevent a trial on the merits. [Citations.]" (25 Cal.2d at p. 410.) The court cited as an example *Wennerholm* v. *Stanford Univ. Sch. of Med.* (1942) 20 Cal.2d 713 [128 P.2d 522, 141 A.L.R. 1358], where the court had applied a new rule before it had been enacted by the Legislature to eliminate a technicality requiring a plaintiff to request leave to amend before seeking appellate review, even though the trial court had already sustained a demurrer without leave to amend. (*Bollinger* v. *National Fire Ins. Co., supra,* 25 Cal.2d at p. 410.) The court also cited the relation back doctrine where an amendment, sought after the limitations period has expired, "will be deemed filed as of the date of the original complaint so long as recovery is sought upon the same general set of facts [citation], recognizing that despite the new filing, the action is still the same." (*Ibid.*)

The Supreme Court held the statute of limitations should not bar a trial on the merits in the *Bollinger* case because the plaintiff's "action is in reality a continuance of the earlier action involving the same parties, facts, and cause of action," the plaintiff had timely filed his action and diligently pursued it, the nonsuit was erroneous and unrelated to the merits and the defendant's delay in bringing the motion contributed to the filing of the complaint beyond the limitations period. (25 Cal.2d at pp. 410-411.) The *Bollinger* court concluded: "Statutes of limitations are not so rigid as they are sometimes regarded. Under certain circumstances property rights or immunities may be acquired as a result of the running of the statutory period, but the period will be extended or tolled by the occurrence of certain events, which may be the subject of conflicting evidence, such as absence from the state or disability. [Citation.] It is established that the running of the statute of limitations may be suspended by causes not mentioned in the statute itself. [Citations.] It is settled in this state that fraudulent concealment by the defendant of the facts upon which a cause of action is based [citation] or mistake as to the facts constituting the cause of action [citations] will prevent the running of the period until discovery. Principles of equity and justice . . . are . . . controlling here. . . . It is sufficient to hold that the equitable considerations that justify relief in this case are applicable whether defendant violated a legal duty in failing to disclose its intention to set up this technical defense, or whether it is now merely seeking the aid of a court in sustaining a plea that would enable it to obtain an unconscionable advantage and enforce a forfeiture." (*Id.* at p. 411.)

The Supreme Court in *Addison* v. *State of California* (1978) 21 Cal.3d 313, 318-319 [146 Cal. Rptr. 224, 578 P.2d 941], later explained: "The rule announced in *Bollinger* is a general equitable one which operates independently of the literal wording of the Code of Civil Procedure. . . . [¶]

[A]pplication of the doctrine of equitable tolling requires timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff."

The equitable tolling doctrine has been applied to a plaintiff who first pursued a workers' compensation remedy which was denied after the limitations period because the plaintiff had not been an "employee" and the plaintiff then filed an action in superior court (*Elkins* v. *Derby* (1974) 12 Cal.3d 410 [115 Cal.Rptr. 641, 525 P.2d 81, 71 A.L.R.3d 839]; see also *Barth* v. *Board of Pension Commissioners* (1983) 145 Cal.App.3d 826 [193 Cal.Rptr. 755]) as well as to a plaintiff who first filed in federal court, then filed in state court after the defendant moved to dismiss the federal action for lack of federal jurisdiction, a motion which was granted after the plaintiff filed the state court action (*Addison* v. *State of California, supra,* 21 Cal.3d 313). Additionally, in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049], while the Supreme Court did not expressly apply the equitable tolling doctrine, it held a plaintiff's action was not barred by the statute of limitations when the plaintiff had timely filed a petition for a writ in the Court of Appeal which was denied without prejudice and thereafter, after the limitations period had expired, refiled the petition in superior court.

The respondents assert the equitable tolling doctrine does not apply when the plaintiff voluntarily dismisses an action; they assert it applies only to involuntary dismissals. To support this assertion, the respondents cite *Wood* v. *Elling Corp.* (1977) 20 Cal.3d 353 [142 Cal.Rptr. 696, 572 P.2d 755]; *Neff* v. *York Life Ins. Co.* (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563]; *Dowell* v. *County of Contra Costa* (1985) 173 Cal.App.3d 896 [219 Cal.Rptr. 341]; *Permanente Medical Group* v. *Workers' Comp. Appeals Bd.* (1985) 171 Cal.App.3d 1171 [217 Cal.Rptr. 873]; *Hill* v. *Allan* (1968) 259 Cal.App.2d 470 [66 Cal.Rptr. 676]; and *Cook* v. *Stewart McKee & Co.* (1945) 68 Cal.App.2d 758 [157 P.2d 868].)[19]

Initially, we note none of the cases applying the equitable tolling doctrine have depended on whether there was a voluntary or involuntary dismissal. Second, the cases cited by the respondents do not, either when read singly or together, establish a general rule that voluntary dismissal precludes application of the equitable tolling doctrine. Rather, these cases turn on the failure to meet the *Bollinger* criteria relating to timely notice, lack of preju-

---

[19] Respondents also cite *Fleishbein* v. *Western Auto S. Agency* (1937) 19 Cal.App.2d 424 [65 P.2d 928]. This case is not applicable. Not only does it predate the *Bollinger* decision, but also it deals with different issues, the application of equitable estoppel and the question whether any fraud or misrepresentation was involved in defendant's stipulation to plaintiff's dismissal of an action in federal court so as to lead the plaintiff to believe the defendant would not oppose plaintiff's filing the same claim in state court after the limitations period had expired.

dice to the defendant and reasonable and good faith conduct on the part of the plaintiff.[20]

■ In contrast, here, all of the *Bollinger* criteria are present. Appalachian notified the respondents of its claim by filing a complaint involving the same parties, causes of action and facts within the limitations period. The respondents have shown no prejudice resulting from application of the equitable tolling doctrine. Appalachian's conduct was reasonable and in good faith. The filing of the second complaint after the limitations period had expired was not due to any dilatory conduct on Appalachian's part but was due to McDonnell Douglas's improper removal of the action to federal court after the limitations period had expired. Appalachian's second complaint was filed immediately following its voluntary dismissal, less than a week after the removal and a little more than two weeks after the limitations period had expired.

Moreover, we note that had Appalachian, instead of voluntarily dismissing the first action in federal court and filing a second action in superior court, pursued the alternative legal remedy of petitioning in federal court for a remand to the superior court, a petition which would have been granted, there would have been no question that Appalachian's action was timely filed within the limitations period. In such a situation there would have been no doubt the case pursued after remand from federal court was the same case as was filed in January.[21] To preclude Appalachian's action here based on Appalachian's decision to dismiss and file a new complaint in superior court rather than to pursue a petition for remand, under the cir-

---

[20]In *Wood* v. *Elling Corp., supra,* 20 Cal.3d 353, the plaintiff's first action was dismissed for lack of prosecution i.e., he failed "to diligently pursue the sole avenue of legal recourse available to him." (*Id.* at p. 360, fn. 4.) In *Neff* v. *New York Life Ins. Co., supra,* 30 Cal.2d 165, the plaintiff failed to show any excuse for the delay. In *Dowell* v. *County of Contra Costa, supra,* 173 Cal.App.3d 896, not only had the plaintiff failed to raise the issue below but also there had been no timely notice to the defendant and the second suit involved different facts and parties. In *Permanente Medical Group* v. *Workers' Comp. Appeals Bd., supra,* 171 Cal.App.3d 1171, there was no showing the plaintiff had been pursuing another legal remedy during the limitations period. In *Hill* v. *Allan, supra,* 259 Cal.App.2d 470, five years separated the filing of the first action, which was voluntarily dismissed pursuant to a settlement, and the filing of the second action. In *Cook* v. *Stewart McKee & Co., supra,* 68 Cal.App.2d 758, the second action involved an entirely separate matter.

[21]For example, McDonnell Douglas argues: "Plaintiffs' discussion of the statute of limitations is egregiously misleading. They begin by stating bluntly: 'The original complaint in this case was filed . . . on January 17, 1986.' That is simply not true. This case is Orange County Civil Action No. 481712, and it is undisputed that the complaint herein was filed *not* on January 17, 1986, but on February 19, 1986, more than two years after the unsuccessful deployment of Westar VI. The other case—the one plaintiffs are referring to—is a different lawsuit, No. 479106, which involved some different parties and which, in any event, was voluntarily dismissed." This argument, focusing so strongly on the docket numbers, would, of course, not apply had Appalachian pursued the remedy of remand from the federal court, since the case number would have remained the same throughout.

cumstances of this case where the federal court stated removal was improper and said it would have remanded the case to the superior court had Appalachian not already dismissed the action, would result in the kind of technical and unjust forfeiture of a trial on the merits that the equitable tolling doctrine was designed to avoid. (See *Bollinger* v. *National Fire Ins. Co., supra,* 25 Cal.2d 399, 410.)

We conclude the action here before us "is in reality a continuance of the earlier action." (*Id.* at p. 410.) Appalachian's complaint, whether governed by Code of Civil Procedure section 338, subdivision 3 or section 339, subdivision 1, was timely filed.

III

*Attorney's Fees*

McDonnell Douglas contends the court erred in failing to award it attorney's fees. McDonnell Douglas first argues it is entitled to attorney's fees because Appalachian's action was frivolous.

Code of Civil Procedure section 128.5, subdivision (a), authorizes a court to order a party to pay reasonable attorney's fees "incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay." The statute defines "frivolous" as meaning "totally and completely without merit" or "for the sole purpose of harassing an opposing party." (Code Civ. Proc., § 128.5, subd. (b)(2).)

Nothing in the record indicates Appalachian's action was brought solely for the purpose of harassing McDonnell Douglas, Morton Thiokol or Hitco or to cause unnecessary delay. Nor was Appalachian's action "totally and completely without merit." Appalachian's contentions the defendants were negligent, the Star 48 motor was defective and that the exculpatory clauses were unenforceable because they were ambiguous, did not reflect the parties' true intent and were unconscionable were contentions with some, if minimal, merit given the clear failure of the Star 48 motor, McDonnell Douglas's position as the sole supplier of the upper stage rocket for the space shuttle and the generally strict judicial review of exculpatory clauses.

Alternatively, McDonnell Douglas argues it is entitled to attorney's fees pursuant to Civil Code section 1717. This section provides for an award of attorney's fees to the prevailing party "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce the provisions of that contract" shall be awarded. McDonnell Douglas, while acknowledging the contract does not contain an

express attorney's fee provision, argues indemnification language in article 7, referring to "costs and expenses," is sufficient to create an obligation to indemnify for attorney's fees as provided in Civil Code section 2778, subdivision 3.

Civil Code section 2778, subdivision 3 states: "In the interpretation of a contract of indemnity, the following rules are to be applied, unless a contrary intention appears:

". . . . . . . . . . . . . . . . . . . .

"3. An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion . . . ."

McDonnell Douglas contends the following language from article 7 is sufficient to entitle it to attorney's fees pursuant to Civil Code sections 1717 and 2778: *"Purchaser shall indemnify and hold harmless [McDonnell Douglas], its officers, agents and employees from and against any and all liabilities, damages and losses, including costs and expenses in connection therewith,* for death of or injury to any persons whomsoever and for the loss of, damage to or destruction of any property whatsoever, caused by, arising out of or in any way connected with the launch or operation of the PAM, Spacecraft, Delta or STS." (Italics added.)

This language might be sufficient to support an award of attorney's fees to McDonnell Douglas (see, e.g., *Citizens Suburban Co.* v. *Rosemont Dev. Co.* (1966) 244 Cal.App.2d 666, 683 [53 Cal.Rptr. 551]), if it were the only language in article 7. Article 7, however, contains other language limiting the indemnification. The final sentence of article 7 states: "The indemnification provisions of this Article 7 *shall not apply* to liabilities, damages or losses suffered under the conditions set forth in Article 14." (Italics added.) The loss here occurred under the conditions set forth in article 14.[22]

---

[22] Article 14 covers losses occurring during "Protected STS Operations" which is defined as: "(1) Beginning with the signature of an Agreement or Arrangement with NASA for Space Transportation System services and (i) when any employee, Payload or property arrives at a United States Government Installation, or (ii) during transportation of such to the installation by a United States Government conveyance, or (iii) at ingress of such into an Orbiter, for the purpose of fulfilling such Agreement or Arrangement, whichever occurs first. [¶] (2) Ending with regard to any employee when (i) the employee departs a United States Government Installation or (ii) the Orbiter if it lands at other than such Installation, or (iii) a United States Government conveyance which transports the employee from such Installation or Orbiter, whichever occurs last. [¶] (3) Ending with regard to a Payload or property, not Jettisoned or Deployed, under the same conditions as set forth in Paragraph 14.1.B.(2) above.

Therefore, the indemnification provision of article 7, referring to "costs and expenses" does not apply; the contract itself reflects an intent not to award attorney's fees under the conditions occurring here. Civil Code section 1717 does not authorize an award of attorney's fees to McDonnell Douglas here.

## DISPOSITION

The judgment is affirmed.

Huffman, J., and Nares, J., concurred.

---

[¶] (4) Ending with whichever occurs last with regard to a Deployed or Jettisoned payload or property (i) after such impacts the Earth; or (ii) if retrieved by the Orbiter, under the same conditions set forth in Paragraph 14.1.B(2) above."